[840 NYS2d 582]

DARRYL BARNES, Respondent-Appellant, v CITY OF NEW YORK et al., Appellants-Respondents.

First Department, July 26, 2007

## APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Julian L. Kalkstein* and *Larry A. Sonnenshein* of counsel), for appellants-respondents.

*Pollack, Pollack, Isaac & DeCicco*, New York City (*Brian J. Isaac* and *Robert M. Simels* of counsel), for respondent-appellant.

## OPINION OF THE COURT

SULLIVAN, J.

This case, involving a claim of excessive force by a police officer in a shooting that left plaintiff paralyzed, presents a clash of dramatic, diametrically opposed accounts of the incident. The appeal follows a verdict in plaintiff's favor against the City and the police officer.

An earlier verdict in plaintiff's favor was reversed by this Court (296 AD2d 330) because of the improper exclusion of evidence of plaintiff's membership in the Five Percenters, a gang known for its anti-white, anti-police attitude, whose members believe in avoiding arrest at any cost. At the retrial, the pretrial deposition testimony of the police officer, defendant Jerome, was read into evidence by plaintiff's counsel. Jerome testified that on August 22, 1988 he was off duty when he and a date got out of his car and two men, one of them plaintiff, walked between them. When Officer Jerome, a recent Police Academy graduate, saw that plaintiff was carrying a gun, he identified himself as a police officer and ordered plaintiff to drop the gun.

Plaintiff responded, "—— you." The officer instructed his date to call the police and began to follow the two men, who separated. Jerome continued to follow plaintiff, screaming at him to stop and identifying himself as a police officer. At one point, plaintiff suddenly turned, pointed the gun he was carrying, a semiautomatic, at the officer and fired, causing the officer to dive to the ground. As the officer, with his gun now drawn, closed in on the fleeing plaintiff, the latter "suddenly turned around and scooped down in a combat position." Unable to see the location of the gun plaintiff was carrying and fearing for his life, Officer Jerome fired at plaintiff as he closed in, believing that he fired only once. Actually, he fired three rounds from his gun "simultaneously." The forensic evidence showed that Officer Jerome had fired his last shot at or near contact range. Plaintiff and the officer then began to struggle. When Jerome raised plaintiff's right hand in the air, he observed the gun, which he eventually succeeded in kicking away. The officer was able to overpower plaintiff. A police car eventually responded. The officer gave his gun to a responding patrol officer who, after asking how many times he had fired, told Jerome that there were three spent shells in the gun.

When asked if he had fired from four to six feet away, Jerome explained that he had fired as he was closing in on plaintiff. Having previously stated that he fired from five to eight feet away, Officer Jerome explained that he had estimated the distance and did not know the exact distance. Jerome's testimony from the first trial—essentially the same as his deposition testimony except that when asked how many times he had fired, he said three—was read into evidence. Jerome also testified at the first trial that when plaintiff began to turn, he could see the gun. When the officer started to rush toward plaintiff, he began to fire and did so until he reached plaintiff.

The responding officers recovered a TEC-9 gun at the feet of plaintiff, who was lying on the ground, as well as two spent shell casings. The gun, similar to an Uzi, was loaded with 13 live rounds and the two casings. The bullets recovered from the gun wielded by plaintiff had hollow points, a type that would explode upon impact, thereby causing more injury than the normal bullet. The police also vouchered some of plaintiff's clothing, including a black jacket and bloodstained shirt. The black jacket had a bullet hole seven inches from the bottom and 10 inches from the right seam. The forensic report reflected that the powder burn around the hole in the jacket indicated

that the gun was fired at a maximum of 12 inches from the jacket. A Police Department "criminalist," upon examining the jacket and shirt, determined that the muzzle of the gun, when fired, was in or near contact with the jacket and shirt. The report showed that Officer Jerome's weapon had been discharged three times. A neurosurgeon who examined plaintiff at the time found an entrance wound at the left side at the level of T-8 vertebrae and an exit wound at the level of T-12. The neurosurgeon testified that, based on the hospital records, plaintiff was shot through the spinal cord and suffered immediate paralysis.

Prior to trial, recognizing the necessity of putting plaintiff's case to the test of cross-examination and anticipating that plaintiff's counsel would seek to avoid such a confrontation, as he had done successfully at the first trial, the City requested and was granted a competency hearing to determine whether plaintiff understood the nature of an oath and had the capacity to give a correct account of the incident, especially in light of his claims of having sustained various mental disorders, including psychosis, as a result of the shooting. Plaintiff called a board certified psychiatrist, as did the City, whose expert visited plaintiff at Lincoln Park Subacute and Rehabilitation Center in New Jersey, where he was a resident. After hearing from both experts, the trial court determined that plaintiff was competent, able to understand the nature and obligation of the oath and with the capacity to give his version of the incident.

Plaintiff's psychiatrist later testified on his behalf at trial. After reviewing plaintiff's extensive medical records, he concluded that plaintiff suffered from bipolar disorder and depression. At times, he testified, plaintiff's illness progressed to the point that he was psychotic. When treated with antipsychotic medication, however, his psychosis could be relieved. The doctor confirmed that the cause of bipolar disorder is unknown. Record entries at Lincoln Park show plaintiff to be alert and responsive, cooperative with fellow patients, but manipulative.

The City read into evidence the testimony of Dr. Paul Carroll, a clinical psychologist who had testified at earlier hearings related to this matter. He was never able to determine why plaintiff has a schizo-affective disorder. Asked if the shooting and paralysis that followed could be the cause of plaintiff's psychiatric disorder, Dr. Carroll answered: "[T]he diagnosis of schizo-affective disorder is not a diagnosis that relates to a physical condition such as paralysis or shooting."

James Hernandez, a professor of criminal justice at California State University, testified as to the nature and character of a gang called the Five Percenters, of which plaintiff was identified as a member. The gang's name reflects its view that five percent of the population consists of African-American men who have achieved self-knowledge. The gang, he testified, had a strong tendency to avoid arrest at all costs, and a strong anti-white, anti-police, as well as an "assaultive" and aggressive attitude. "They didn't feel that they were subject to the laws," Hernandez testified.

Notwithstanding that plaintiff was found fit to testify at trial, plaintiff's counsel requested that the trial court allow him to read to the jury selected portions of a transcript of plaintiff's testimony given at a General Municipal Law § 50-h hearing held on September 15, 1989. The court permitted the reading of such testimony over the City's objection that such transcript can be read in lieu of a plaintiff's testimony only if the requirements of CPLR 3117 have been met (*Claypool v City of New York,* 267 AD2d 33, 35 [1999]), which, the City argued, had not been shown.

When the court noted that plaintiff was in a state hospital in New Jersey, the City's attorney stated it was his understanding that plaintiff was not committed and was allowed to leave. In fact, he had left the facility in the past. Counsel argued that plaintiff's attorney was simply refusing to produce plaintiff and "would not," as opposed to "could not," produce him. He also noted that while plaintiff had not voluntarily gone to the hospital in New Jersey, he was now voluntarily staying out of the state. Plaintiff's attorney made no attempt to dispute these statements. The trial court ruled that the section 50-h testimony was admissible. In justifying its ruling, the court, without any basis in the record therefor, stated:

> "He's not committed but he is also—he was declared a danger to himself and others, I trust, by the Courts of the State of New York and for that reason he was confined to a mental institution, not released, and the mental institution that he was confined to sought to forward him to an institution in Jersey where he can get the proper treatment."

Thus, plaintiff was excused from testifying and his 50-h hearing testimony was read to the jury.

Plaintiff's version of the incident, as he testified at his 50-h hearing, is as follows. On August 22, 1988, at about 8:30 P.M., he

took a cab with his friend, Radcliff, to meet a girl, Adelia, whom he had met a few days earlier. Plaintiff and Radcliff traveled to 170th Street and Ogden Avenue in the Bronx. Although he had known Radcliff for two years, plaintiff was unable to recall his first name or where he lived. After arriving at their destination, plaintiff went to the corner to telephone his friend, Bobby, last name unknown. When he concluded his phone conversation, he found Radcliff in an argument with "some guy." The argument got loud and, as the other man began reaching for a gun, Radcliff punched him in the face. The gun fell to the ground and plaintiff, after picking up the gun, began to run with Radcliff.

As plaintiff was running, he heard "freeze, police." In response to the renewed command, given later, after he ran some more, plaintiff got on the sidewalk, dropped or threw the gun he had earlier retrieved to the ground and raised his hands over his head. As he turned his head to the right to explain, he was shot. Plaintiff felt the officer's hand on his right side and felt the officer's weapon. Asked if he had fired any shots that night, plaintiff answered, "No, I did not." Indeed, plaintiff claimed he had never handled a gun before.

Plaintiff subsequently pleaded guilty to attempted assault in the first degree (use of a deadly weapon) for shooting at Officer Jerome, and was sentenced to five years' probation.

█ Finding that the shooting of plaintiff by Officer Jerome was unjustified, the jury returned a verdict in plaintiff's favor, awarding him substantial damages. The trial court reduced the damage award, which is not at issue on appeal. In ruling on the City's posttrial motion based on the impropriety of allowing the reading of plaintiff's 50-h hearing testimony even though he was found competent to testify and had made himself unavailable, the court found that "the Medicaid program had placed the plaintiff in the State of New Jersey, not the plaintiff himself," thereby making him unavailable. The determination to allow plaintiff's 50-h hearing testimony to be read in evidence was clear error. We now reverse and dismiss the complaint.

In order to use a party's 50-h hearing testimony in lieu of appearing and testifying at trial, a plaintiff must satisfy one of the five requirements of CPLR 3117 (a) (3) (*see generally Claypool*, 267 AD2d at 35). At trial, plaintiff's attorney, apparently invoking CPLR 3117 (a) (3) (ii), argued that plaintiff was an unavailable witness because he had been sent from the Bronx Psychiatric Center to Lincoln Park in New Jersey. That subsection provides that a deposition of a party may be used if the court

finds "that the witness is at a greater distance than one hundred miles from the place of trial or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition."

Thus, a party may not voluntarily absent himself and then use his deposition testimony or, as here, his 50-h hearing testimony (*see Dailey v Keith*, 1 NY3d 586, 587 [2004] ["By voluntarily leaving the state and refusing to return for trial, defendant procured her own absence and, therefore, failed to satisfy CPLR 3117 (a) (3) (ii)"]). Before any deposition may be introduced in court, it must appear not only that the declarant is unavailable, "but also that his absence is not due to the act or neglect of the hearsay's proponent" (*Jobse v Connolly*, 60 Misc 2d 69, 70 [1969]).

It appears that the trial court was moved to rule as it did because of its belief that plaintiff was removed from the state involuntarily. There was, however, no evidence before the court that plaintiff was ever civilly committed. Plaintiff has never argued, then or now, that such was the case. Nor has he argued, then or now, that he was not free to come to New York to testify. Plaintiff's only argument on this point on appeal is that his departure from New York was not voluntary and that the trial court "properly stated" that plaintiff "was declared a danger to himself and others, I trust" by the courts of New York and confined to a Bronx psychiatric facility that transferred him to New Jersey for treatment. There is no record evidence of a finding of such dangerousness. In fact, plaintiff's counsel did not dispute the City's assertion that plaintiff was in a nursing home, not a psychiatric facility, and that he was not confined. Nor does he contest this assertion on appeal.

Plaintiff's only response to the central issue—whether his absence from the trial was by choice—is no more than an artful avoidance, i.e., to infer from the trial court's statement that he was declared a danger to himself and others and was confined to a mental institution that "his presence out-of-state was not done voluntarily." This is, of course, beside the point. The plain fact is that there is no evidence that plaintiff was not free to return to this jurisdiction to testify. It was his burden to show that his failure to return was involuntary (*see McGuigan v Carillo*, 150 Misc 2d 881, 883 [1991] [to invoke CPLR 3117 for use of deposition, proponent must come forward with appropriate proof]; 5 Wigmore, Evidence § 1414 [Chadbourn rev 1974]).

Citing CPLR 3117 (a) (3) (iii), which permits the reading of a deposition where "the witness is unable to attend or testify

because of age, sickness, infirmity or imprisonment," plaintiff now argues, in support of a claim he raised for the first time on the postverdict motion, that he was unable to appear for trial because of a debilitating mental disease and physical disability. Plaintiff, however, offers no evidence that his physical condition prevented him from returning to New York, and his reliance on his psychological condition fails in light of the court's finding that he was competent to testify, a ruling he does not challenge. Plaintiff posits it is "clear that although [he] may have been legally 'competent' to testify, his presence at trial would have been a huge distraction and more importantly, he would have been totally unresponsive and uncooperative." Plaintiff's own expert, Dr. Schwartz, testified at the competency hearing, however, that if plaintiff took his medication, he would be able to testify. Also, the City's expert noted that plaintiff's anger was selective, a view shared by Lincoln Park staff members. Of course, if plaintiff chose to refuse to take his medicine, thereby rendering himself unable to testify, or if he was "unresponsive" or "uncooperative," his conduct would equate to a voluntary absence from trial to avoid testifying.

By avoiding his obligation to testify at a trial in which he was seeking millions of dollars, plaintiff was able to frustrate the City's fundamental common-law right to cross-examine a witness (see Matter of Friedel v Board of Regents of Univ. of State of N.Y., 296 NY 347, 352 [1947] ["Cross-examination of adverse witnesses is a matter of right in every trial of a disputed issue of fact"]). Plaintiff, of course, had good reason to avoid coming to court to testify. His strategy denied the City the opportunity to confront and test his credibility on such matters as his assertion that he had no familiarity with guns and that he did not fire at the officer, and to impeach him by way of his plea of guilty to attempted assault in the first degree (i.e., by means of a deadly weapon). That deadly weapon was found at plaintiff's feet with two empty shell casings, thus corroborating the officer's account that plaintiff had fired the gun at him.

The City was also denied the opportunity to explore plaintiff's association with the Five Percenters. In addition, allowing plaintiff to escape cross-examination denied the jury the opportunity to see and hear him (see generally Hedaya Home Fashions, Inc. v American Motorists Ins. Co., 12 AD3d 639, 640 [2004], lv denied 4 NY3d 708 [2005] ["Great deference is accorded to the fact-finding function of the jury, and determinations regarding the credibility of witnesses are for the factfind-

ers, who had the opportunity to see and hear the witness"]). With regard to the CPLR requirements for the use of depositions, it has been noted:

> "The tenor of all of CPLR 3117 (a) (3) is that a person capable of testifying in person and subject to judicial process or a party's control so as to compel the testimony should be on display before the trier of fact and subjected to the rigors of confrontation and cross-examination" (Connors, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3117:8).

■ The trial court improperly allowed counsel to read plaintiff's testimony from his 50-h hearing; the verdict and judgment thus cannot stand. The question, then, is whether—once the 50-h hearing testimony is excluded—plaintiff has made out a prima facie case. A review of the record reveals that he has not. As plaintiff would have it, his 50-h testimony painted a picture of someone who did not pose a threat to the police officer—he was unarmed and his hands were in the air, and thus presented no basis on which Officer Jerome could perceive a threat. Without plaintiff's 50-h testimony, a completely different case was presented to the jury. Officer Jerome's testimony provided the jury with a description of a police officer, just out of the Academy, tracking down an armed and dangerous person on the streets of the Bronx, who fired at plaintiff only after plaintiff shot at him.

Plaintiff's rebuttal to the officer's account was to argue that it contained inconsistencies and "different versions." Nor is plaintiff able to cobble together record support for his argument that the fact that the hole in his shirt was higher than the hole in his jacket demonstrates that he had his hands in the air. Even if the jury disbelieved Officer Jerome, there is no proof, absent plaintiff's 50-h hearing testimony, that the shooting of plaintiff was unjustified. Concededly, Officer Jerome's testimony had its inconsistencies and the jury was free to reject it. This does not end the matter, however, for discrediting testimony contrary to that necessary to the burden of proof does not satisfy that burden (see Moore v Chesapeake & Ohio R. Co., 340 US 573, 576 [1951]). Without plaintiff's 50-h hearing testimony, there is no evidence of plaintiff's version of the incident. Thus, plaintiff did not make out a prima facie case and the complaint should be dismissed.

That the trial court contributed to plaintiff's shortfall in proof by erroneously allowing his counsel to read his 50-h hearing

testimony does not justify a remand for a new trial. It was counsel's choice, deliberate and calculated, to withhold his client from the rigors of cross-examination—an understandable strategy, given plaintiff's unsavory background and conviction of attempted assault in the first degree for his actions in the very incident in question. In that regard, plaintiff has charted his own course and must abide by the consequences.

Our determination renders academic the other issues raised which, in any event, are without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Bertram Katz, J.), entered February 17, 2005, which, after a jury trial, found in favor of plaintiff and against defendants, and awarded damages, should be reversed, on the law, without costs or disbursements, and the complaint dismissed. The Clerk is directed to enter judgment accordingly.

MAZZARELLI, J.P., ANDRIAS, WILLIAMS and McGUIRE, JJ., concur.

Judgment, Supreme Court, Bronx County, entered February 17, 2005, reversed, on the law, without costs or disbursements, and the complaint dismissed. The Clerk is directed to enter judgment accordingly.