OPINION OF THE COURT
James D. Pagones, J.
This petition pursuant to EPTL 2-1.7 (b) for a decree (1) declaring that Juan M. Lafuente died on September 11, 2001, and (2) permitting his wife Colette to file a probate proceeding with respect to a will executed by him, dated June 30, 2000, is granted as follows:
*578 A hearing was conducted at which testimony was received from the petitioner Colette Lafuente, the spouse of Juan M. Lafuente (the absentee), Catherine Lafuente an adult child of the couple, Barry Horowitz, an acquaintance of petitioner and the absentee, and Detective Walter Horton of the City of Poughkeepsie Police Department. Documentary evidence in the form of an article appearing in the New York Times on December 31, 2001 and Detective Horton’s exhaustive investigative report were submitted. Also considered was an affidavit from Ralph Nadal. This individual was the absentee’s supervisor at Citibank, his place of employment.
The evidence indicates that petitioner and the absentee were married on June 20, 1964. They have four adult daughters as a result of their 37-year marriage ranging in age from 35 to 21. Petitioner is the Mayor of the City of Poughkeepsie. She is also a school teacher. The absentee had a lifetime career working with computers. He was employed by IBM Corporation for 31 years. In 1993 he was released from his employment when IBM downsized. In October 1997, he commenced working for Citibank in New York City where he performed work in the computer field.
The absentee was a commuter. It was customary for him to take the train to New York City from the Poughkeepsie station. He would normally take the 6:43 a.m. train to Grand Central station, Monday through Friday. Upon arrival, he would take a subway to the Broadway and Wall Street stop near the World Trade Center. A relatively short walk of seven blocks to the Citibank offices at 111 Wall Street followed. Once or twice, a month when he would work late he would stay overnight at the Dexter House located at West 86th Street in Manhattan. He was known to the employees at the hotel.
September 11, 2001 started out bright and sunny on the east coast. By 9:00 a.m. the daily routine of life, work and play was permanently changed by the premeditated acts of terrorism in New York City, Washington, D.C., and the sky over the Commonwealth of Pennsylvania.
The proof indicates that on that black day in American history the absentee deviated from his normal routine in traveling to New York City. He left his residence at 110 Hooker Avenue, Poughkeepsie, a little earlier that morning in order to drive his 1985 Volvo station wagon to the New Hamburg station in the Town of Poughkeepsie in order to take the 6:27 a.m. train to Grand Central. This station is south of Poughkeepsie and closer to Fishkill, New York. The absentee had scheduled *579 an appointment with Dr. Ronald Podell, a psychiatrist, for 8:00 p.m. that day. Dr. Podell had been treating the absentee for depression. There would be less distance for the absentee to drive from New Hamburg to Fishkill instead of Poughkeepsie.
The evidence indicates that the absentee used his Metro Card at 8:06 a.m. to take the No. 4 subway from Grand Central to the Broadway and Wall Street stop. That ride normally takes approximately 16 minutes. The stop is approximately one and a half blocks from the World Trade Center.
On the morning of September 11, 2001, the firm of Risk Waters Financial Technology Congress, London, England, was conducting a trade show on the 106th floor of the North Tower No. 1, World Trade Center. The North Tower was struck by a highjacked airliner at 8:48 a.m. A second attack by another highjacked airliner struck the South Tower at 9:18 a.m. Both towers eventually collapsed as the world watched in horror. Thousands perished. The absentee has not been heard from since that fateful day.
The issue under consideration is whether the absentee has been “exposed to a specific peril of death” as set forth in EPTL 2-1.7 (b) to sustain a finding that he died less than three years after the date his absence commenced. By using syllogistic reasoning and incorporating compelling circumstantial evidence into this deductive scheme, an affirmative determination to the issue is warranted.
Procedurally, the court notes that the Governor signed Executive Order No. 113.24, dated September 24, 2001, as part of a series of emergency executive orders emanating out of the terrorist attacks on September 11, 2001. This order, among other things, dispenses with service of process as required by Surrogate’s Court Procedure Act § 902 so far as it requires service of process to persons missing or deceased as a result of the terrorist attacks. That order was most recently continued on March 8, 2002 (Order No. 113.49). The four Lafuente daughters have executed waivers of process and consent to the relief requested in this petition, including the probate of their father’s will. That instrument is dated June 30, 2000. His wife Colette is the sole beneficiary and nominated executrix. No other instrument has surfaced since September 11th suggesting an alternative testamentary scheme.
EPTL 2-1.7 provides that:
“(a) A person who is absent for a continuous period of three years, during which, after diligent search, *580 he or she has not been seen or heard of or from, and whose absence is not satisfactorily explained shall be presumed, in any action or proceeding involving any property of such person, contractual or property rights contingent upon his or her death or the administration of his or her estate, to have died three years after the date such unexplained absence commenced, or on such earlier date as clear and convincing evidence establishes is the most probable date of death.
“(b) The fact that such person was exposed to a specific peril of death may be a sufficient basis for determining at any time after such exposure that he or she died less than three years after the date his or her absence commenced.” (Emphasis added.)
Here, the focus is on the surprise attack perpetrated by terrorists on the World Trade Center in New York City on September 11, 2001. The phrase “at any time after such exposure” was added by Laws of 2000 (ch 413), effective August 30, 2000. According to the 2000 Report of the Surrogate’s Court Advisory Committee to the Chief Administrative Judge of the Courts of the State of New York in support of the legislation, the amendment “would reaffirm that a determination of death may be made at any time after exposure to specific peril.” (2000 McKinney’s Session Laws of NY, at 2239.)
The evidence indicates that prior to September 11, 2001 petitioner and the absentee enjoyed a long term marriage. They had vacationed together in Dominica, a small country in the eastern Caribbean near Guadeloupe as recently as July 2001. All the evidence pointed to a solid marriage. The absentee enjoyed a good relationship with all of his daughters. He was gainfully employed. Finances were not the source of any stress. There was no evidence to indicate that the absentee was engaged in any type of criminal activity. No substantial withdrawals from a joint checking account maintained with the petitioner or any other accounts in the name of the absentee occurred prior to September 11th or afterwards. Two jointly held charge cards of the couple reflect customary usage before the terrorist attack and none by the absentee after September 11, 2001. He had an American Express Card which reflects no use after September 11th.
The only items of clothing belonging to the absentee missing from the residence at 110 Hooker Avenue are the ones he wore *581 when he left for work. None of his toiletry items are missing. The absentee did possess a passport. It has not been recovered. The Mayor testified that the absentee fled his native country of Cuba when Fidel Castro came into power in 1959. He was naturalized in this country in 1965. He could not return to Cuba for fear of being imprisoned, although he and the Mayor did talk about going there someday.
The Mayor first learned of the terrorist attack at approximately 9:05 a.m. the morning of September 11th. She was positive the absentee would have called her to assuage any concerns had he survived. He did not. She went to the New Hamburg train station between 4:00 p.m. and 5:00 p.m. to await her husband’s return. When he did not, she returned home. She started calling hospitals in New York City at approximately 3:00 a.m. the morning of September 12, 2001 when she did not hear from him. The Mayor reported her husband as a missing person to the City of Poughkeepsie Police Department the same day. Detective Walter Horton was assigned to investigate the matter. His comprehensive five-page report, supplemented by a one-page addendum, dated December 10, 2001, described in painstaking detail the efforts undertaken to locate the absentee, as well as the extraordinary response by government agencies in the aftermath of the attacks.
Mayor Lafuente and her four daughters have not heard from the absentee since September 11th. The absentee has two brothers and one sister living in the United States, none of whom have heard from him since that day.
Barry. Horowitz is a patron of the Roma Deli, 200 Hooker Avenue, Poughkeepsie, New York. Mr. Horowitz was familiar with the absentee and the Mayor. On either the morning of Saturday, September 8th, or Sunday, September 9, 2001, he was at the deli at the same time as the absentee. He overheard a portion of a conversation between the absentee and an unidentified male person while delivering a sandwich at the request of the deli’s owner to the absentee. Mr. Horowitz overheard the absentee tell the other man that he was planning on attending a meeting the following week at the World Trade Center. He returned to the counter after delivering the sandwich without hearing any more of the conversation.
The affidavit of Ralph Nadal, the absentee’s supervisor at Citibank, states that members of his department are not bound by time frames. They have the discretion to arrive and depart as their schedules dictate as long as their work is accomplished. It was the absentee’s practice to attend technical or profes *582 sional conferences without informing him in advance and advise him of the results later. No coworker at Citibank has heard from him since the date of his disappearance.
The evidence indicates that Risk Waters Group Financial Technology Congress is a company with whom the absentee had previously conducted business on behalf of Citibank. Risk Waters hosted a trade show on the 106th floor, North Tower, World Trade Center, on September 11, 2001. The absentee was not preregistered for the trade show. However, walk-ins were permitted. None of the individuals known to have attended the trade show have been heard from since the attacks.
The investigative report of Detective Walter Horton, coupled with his testimony at the hearing, reveals that the absentee used his Metro Card for the No. 4 subway on the Lexington Avenue Line at 8:06 a.m. on September 11, 2001. It normally took more or less than 16 minutes to travel to the absentee’s normal subway stop at Broadway and Wall Streets. At that point he was less than two blocks from the World Trade Center Complex. Under the circumstances, there was sufficient time for the absentee to walk to the North Tower and place him in that building just before it was attacked at 8:48 a.m.
Detective Horton assisted with establishing a DNA profile for the absentee for comparison with recovered unidentified bodies and body parts with negative results. The absentee’s train and subway routes were retraced with flyers handed out to commuters containing his picture. No one could pinpoint seeing the absentee on September 11, 2001, although many recognized his picture. Flyers were posted around the site of the World Trade Center disaster. A New York Post article along with the absentee’s picture produced no leads as to his whereabouts. The same result occurred when the NBC television program Dateline aired an interview with Mayor Lafuente and Detective Horton publicizing the absentee’s disappearance. A composite of missing persons, including the absentee, appeared in the December 31, 2001 edition of the New York Times. It did not generate any positive response or information.
The absentee was seeing Dr. Donald Reape in New York City for a heart condition. The doctor’s office is located at 170 Williams Street near the World Trade Center. The doctor does not schedule appointments on Tuesdays. September 11, 2001 was a Tuesday. The absentee’s next appointment with the doctor was September 21, 2001. He did not keep it. Nor did he keep the appointment with his psychiatrist the evening of September 11, 2001. Neither medical provider has heard from the absentee since that day.
*583 Various hot line telephone numbers established by the Federal Emergency Management Association (FEMA), New York City Mayor’s office and American Bed Cross were contacted by the detective with negative results. Calls to the temporary morgue for updates on the identity of newly identified victims revealed nothing.
The absentee’s outgoing calls through Citibank for August through September 11, 2001 were accessed, along with his voice mail with no unusual results. The absentee’s coworkers who were interviewed spoke of him in positive terms. None of them suggested he was experiencing job related or marital difficulties. At least one recalled the absentee stating he expected to be a little late for work on Tuesday, September 11th. The absentee had a pager issued by Citibank. Messages were left by Detective Horton after September 11th without a response.
Nobody at the Dexter House has seen or heard from the absentee since the terrorist attacks.
EPTL 2-1.7 (b) allows for proof of death of a person before the end of three years if it can be demonstrated that the person was exposed to a specific peril of death. An important factor in a proceeding of this type is proof of exposure to a catastrophe or peril. In the past, exposure to such disasters as the loss of an airplane or vessel, an earthquake, explosion or severe fire or a person seen leaping from a bridge from a height no person could survive have qualified. (2 Warren’s Heaton, Surrogates’ Courts § 32.10 [2], at 32-69 [6th ed rev].) The unprecedented terrorist attacks on American soil on September 11, 2001 rightly qualify as disasters of national magnitude.
The absence of a body does not preclude a finding of death. If the body is not located and identified at the scene of calamity, there must be reliable evidence that the absentee was in the place destroyed at the moment the disaster took place. (2 Warren’s Heaton, supra at 32-69.) Here, the evidence clearly indicates that the absentee was in the immediate vicinity of the World Trade Center and, in all likelihood, in the North Tower when the first airliner struck. The subsequent collapse of both World Trade Center Towers has made it extremely difficult, if not impossible, to recover his body. To date, all inquiries made to New York City, Staten Island and northern New Jersey hospitals with a description of the absentee have produced negative results. Nor has a DNA profile caused a positive identification from body parts and items of personal property recovered from the attack site.
*584 The proof has clearly established that the absentee was exposed to the terrorist attacks on September 11, 2001, that a diligent search was undertaken to locate him, and his absence cannot be otherwise explained. (2 Warren’s Heaton, § 32.10 [8], at 32-74.) That the terrorist attacks somehow served as the catalyst for the absentee to spontaneously abscond in the face of what is actually known is illogical. All of the evidence suggests that the absentee was in the North Tower in proximity to where the first plane struck. The absentee was described in polite terms by his wife and Detective Horton as a frugal person. He would often take advantage of trade shows offering free refreshments such as the one sponsored by Risk Waters the morning of September 11th. It is tragically ironic that the absentee’s zest for thriftiness was the underlying factor which may have contributed in large part to his unexpected demise.
Under the totality of the circumstances, there is no reasonable explanation for his disappearance other than death by an act of terrorism. Therefore, the court determines that Juan M. Lafuente died September 11, 2001. Petitioner may file a petition for probate of the decedent’s will, dated June 30, 2000, with all convenient speed.