[851 NYS2d 141]

# In the Matter of a Judicial Declaration of Death of Sneha Anne Philip. Ronald Lieberman, Appellant.

First Department, January 31, 2008

### APPEARANCES OF COUNSEL

*Marc Bogatin*, New York City, for appellant.
*Ellen Winner*, Brooklyn, Guardian ad Litem.

## OPINION OF THE COURT

SAXE, J.

Dr. Sneha Anne Philip, a young physician who lived with her husband in the shadow of the World Trade Center, left her home on the evening of September 10, 2001, and never returned or was heard from again. Her husband, having done everything he could to investigate her disappearance, finally accepted the conclusion reached by professional investigators that she had died in the inferno of September 11, and sought a court declaration to that effect. The evidence he submitted was based upon circumstantial evidence, habit, and his wife's predisposition to help others according to the highest calling of her medical profession. The Surrogate declined to issue the requested decree, assessing the evidence to be insufficient to establish her presence at that time and place. We believe that the record properly supports the position advanced by petitioner, and we therefore reverse.

This is a disturbing case. The central difficulty is that there is no direct evidence establishing that the decedent was at the site of the attack on the World Trade Center on September 11, 2001. It is therefore understandable that the Surrogate applied EPTL 2-1.7 (a), which creates a presumption of death three years after a person's disappearance, or on such earlier date as clear and convincing evidence establishes, if that person has been "absent for a continuous period of three years, during which, after diligent search, he or she has not been seen or heard of or from, and whose absence is not satisfactorily explained." However, upon consideration, despite the absence of direct evidence, we agree with petitioner that it is appropriate here to apply subdivision (b) of EPTL 2-1.7, which authorizes a decree of death for a date earlier than the end of the three-year period based upon "[t]he fact that such person was exposed to a specific peril of death."

Although petitioner had to rely solely on circumstantial evidence to establish his claim that the the wife's death was due to the "specific peril" of the attack at the World Trade Center on September 11, 2001, we find that his claim was nevertheless successfully established by the showing that EPTL 2-1.7 (b) requires. Notably, although the Surrogate applied the "clear and convincing" standard set forth in EPTL 2-1.7 (a), subdivision (b), unlike subdivision (a), does not specify that a clear and convincing showing is required to establish that the absentee was exposed to a "specific peril of death." But, even assuming

that the clear and convincing standard is applicable, the standard does not require an absolute certainty; it merely requires that the evidence make the conclusion "highly probable" (PJI 1:64). Even without direct proof irrefutably establishing that her route that morning took her past the World Trade Center at the time of the attack, the evidence shows it to be highly probable that she died that morning, and at that site, whereas only the rankest speculation leads to any other conclusion.

Petitioner and his wife resided very near the World Trade Center. He established with his testimony that his wife was away from home overnight on September 10, 2001, which was a common occurrence in their marriage, and that whenever she was out overnight she consistently returned home between 7:00 and 9:00 the following morning. Consequently, it may be inferred that she was returning home on September 11, 2001 within that time frame. He also established that his wife was a physician whose outgoing personality made it likely that she would volunteer to aid injured people, which takes on particular importance in view of the testimony of the police detective that the first responders at the World Trade Center had called out for the assistance of any medical professionals nearby.

It was established by videotape from the surveillance camera in the lobby of the couple's building that she left their apartment the evening of September 10, 2001 at about 5:00, and credit card records and store surveillance camera videotape show that she had been shopping at the Century 21 department store during the evening of September 10, 2001. However, substantial investigation found no leads as to where she went thereafter. There was also videotape taken at 8:43 A.M. on September 11 by the surveillance camera in the couple's building, which showed a woman with some similarity to the decedent leaving the building just five minutes before the first attack, but the quality of the footage was too poor for petitioner to identify the woman as his wife. Petitioner was particularly unconvinced since, as far as he knew, she had not returned home by the time he left at 6:30 that morning, and there was no subsequent indication in the apartment that she had ever brought home the packages containing the items she bought the night before at Century 21. Nevertheless, the investigating New York City police detective, Richard Stark, who observed the videotape from that morning, tended to believe that it was her, based upon her dress style, hair style, mannerisms, height and weight, and based upon his recollection that her mother told

him that she had been planning on shopping in the World Trade Center mall that morning.

Although the decedent's mother did not testify to having made the statement attributed to her by Detective Stark, she testified that on September 7, 2001, her daughter said that during the coming days she planned to visit Windows on the World, the restaurant at the top of one of the World Trade Center towers, in advance of a relative's plan to hold her wedding reception there.

There is no claim, or evidence, that the decedent voluntarily absconded. She had left behind in their apartment her glasses (she was wearing contact lenses), her passport and her identification. Nor were there any unusual financial transactions prior to her disappearance, or any transactions at all on her accounts thereafter. In addition, the mother's testimony established that she and her daughter were very close, and spoke by telephone at least once a day, but that she had not heard from her daughter since their final conversation via instant message on the afternoon of September 10, 2001. It was also established that the decedent used her credit card to purchase items at the nearby Century 21 store the evening of September 10, 2001, but never used that card or any other thereafter.

Since there is every reason to conclude that the decedent did not remain alive after September 11, 2001, the only question is whether there is a clear and convincing showing that she met her death through the terrorist destruction of the World Trade Center rather than by some other means.

While it is logically possible that the decedent died by some other means on that date, either by random violence or at the hands of someone she met the night before, there is no factual basis in the evidence for that conclusion, while the demonstrated facts strongly support the inference that her death occurred in the context of the World Trade Center attack. The testimony powerfully suggests that she was in the area at the time of the attacks, either returning home, or having just left home again five minutes before the first attack at 8:48 A.M., whether on her way to shop at the mall, to look at Windows on the World, or do some other errand. Petitioner's testimony regarding his wife's personality tends to establish that, as a responsible physician in the area when the attacks occurred, she would have gone in and volunteered to provide medical assistance to the victims.

Importantly, thorough investigations by a police detective and a private investigator turned up absolutely no evidence of foul

play, and both the detective and the investigator independently concluded that the decedent must have died in the World Trade Center on September 11, 2001. As Police Detective Richard Stark reasoned, if she had died on that date by some other cause, "she would have turned up by now." He explained that in his experience, while bodies may occasionally turn up years later, they almost always turn up.

The Surrogate seems to have given undue credence to the suggestion of the court-appointed guardian ad litem (GAL) that aspects of the decedent's lifestyle sufficed to support the conclusion that she met her death through some other cause. The GAL and the court also seem to have relied upon the substance of multiple hearsay statements in police reports that were attributed to petitioner, but about which no inquiry was made of petitioner at the hearing. Indeed, it does not appear that those police reports were even introduced at the hearing.

For instance, the GAL's report makes reference to "drug and/or alcohol problems" and, even more insistently, to "the absentee's *persistent* drug and alcohol abuse" (emphasis added). However, facts to support the bulk of these assertions were never developed with a proper evidentiary showing. While the police detective acknowledged in his testimony his conclusion that the decedent appeared to have a "personal problem" involving drinking, in that "she liked to go out and have a good time; and she would drink possibly all night long and then come home," he did not consider the drinking to be a factor in her disappearance. Similarly, private investigator Ken Gallant also explicitly made a point of rejecting the notion that petitioner's wife was "out there drinking six nights a week." Indeed, there was no evidentiary basis for the suggestion that her drinking posed the type of "problem" that should be viewed as potentially causative of her death, either medically or due to a lack of judgment. Furthermore, the detective testified that he found *no* proof that she had a "drug problem" as the GAL asserted.

As to the GAL's implicitly value-laden assertion that the decedent "frequented bars (including several bars which cater to women customers) and spent the night with individuals she met there," which individuals "tended to be strangers rather than persons with whom she developed relationships," here too the evidence completely failed to establish that the decedent engaged in conduct endangering her safety. The unacknowledged implication of the GAL's assertion in this regard, namely, that the decedent recklessly engaged in extramarital sexual relations

with dangerous strangers she met in bars, is not a conclusion permitted by the evidence. Petitioner did acknowledge being upset when his wife did not tell him where she was spending the night, and that it was "a point in our relationship that we were trying to work out." But, his testimony was somewhat oblique as to specifics on the subject of his wife's nights away; he explained, "it was never a question if we were ever unfaithful to each other. . . . It was always a question of being independent people, living together, trying to have independent lives and being together." Notably, the GAL never asked petitioner to clarify exactly what occurred. But regardless of whether petitioner was completely forthright in his testimony regarding his wife's nights out, there is no question that they had a happy marriage, and, importantly, there was *no* evidence that his wife's nights out involved *any* risky behavior.

To the extent a police report contained in the record included inflammatory and provocative assertions accusing the decedent of "abusing drugs and alcohol and . . . conducting bi-sexual acts," these aspects of the report amounted to multiple hearsay that, even if the report had been properly admitted, could not be properly relied upon as established fact (*see State Farm Mut. Auto. Ins. Co. v Langan*, 18 AD3d 860, 862-863 [2005]). Notably, although the GAL had the opportunity to cross-examine both Detective Stark and petitioner, to confirm or clarify the statements purportedly relayed by Detective Stark to the officer who prepared the police report, she failed to do so, and their testimony did not bear out any of those inflammatory hearsay statements. Indeed, it appears that these police reports were not offered or admitted as evidence at the hearing, but were instead simply appended to the GAL's post-hearing report. As such, any reliance by the court on purported facts asserted in those reports but unproved at hearing was improper.

Those aspects of the GAL's report regarding the conduct of the decedent that *were* supported by actual evidence, such as the assertion that she had on occasion gone home with people she met at bars, did not alone support the GAL's conclusion that the decedent thereby "engaged in risky behavior." There was simply no showing that she took risks in doing so. Accordingly, although it is possible that the decedent met "some other unfortunate fate," the evidence clearly made it highly probable that she died in the World Trade Center attack, while it failed to point to any other inference.

The dissent's characterization of the decedent's personal and professional life as "unstable" similarly implies that some vague

alternative possibilities exist to explain her disappearance, although no such alternative possibilities were proved, or even expressly suggested.

The Surrogate questioned petitioner's credibility based upon so-called "disparities" between his testimony and remarks attributed to him in the police reports. However, absent any questioning of petitioner about those purported remarks contained in the police report, or even any questioning of Detective Stark, who is said to have related the remarks to the officer who wrote up the report, it was simply improper to rely on those multiple hearsay statements to make a credibility finding. Moreover, even if petitioner was chargeable with failing to acknowledge discord in his marriage, that missing information had no impact on the relevant facts.

The Surrogate's observation that the court had not been provided with "a cohesive picture of the circumstances leading up to [the decedent's] disappearance" serves to impose on petitioner a standard beyond that to which he should be held. The missing information as to where his wife spent the night of September 10-11, 2001, like the missing acknowledgment of marital discord, does not preclude, or even undermine, a determination, based upon the evidence petitioner presented, that it is highly probable that his wife died in the World Trade Center's destruction. All the evidence points to that conclusion, whether she passed the disaster area on her way home from her night out, or whether, as Detective Stark seemed to conclude, she had returned home earlier and left the building again at 8:43 A.M. on September 11.

While *Matter of Lafuente* (191 Misc 2d 577 [2002]) is not controlling, the parallels are interesting. There, while it was proved that the absentee got on the number 4 subway line at Grand Central at 8:06 A.M. on September 11, 2001, which line he normally took to the Wall Street station to get to his job at Citibank, the only evidence connecting him with the World Trade Center on September 11, 2001, was (1) testimony of an acquaintance of the absentee who said that the prior weekend, he overheard the absentee tell someone else that he intended to attend a meeting in the World Trade Center some time the next week, and (2) evidence that a client of the absentee's employer was hosting a trade show at the World Trade Center on September 11, 2001. Similarly, in the case now before us, the decedent lived near (rather than worked near) the World Trade Center, and, as the decedent's mother testified, the decedent had told another

individual that she had plans to visit the World Trade Center within the time frame of 9/11. The similarities are striking, and the distinctions drawn by the dissent regarding the length of the absentees' respective marriages and places of employment, and the existence of a criminal prosecution, are irrelevant. I particularly note that all the testimony indicated that the criminal matter had no impact on the decedent's actions or state of mind. Consequently, like the court in *Lafuente*, we conclude that the evidence is sufficient to support the finding that the decedent was present at and killed in the World Trade Center attack on September 11, 2001.

Accordingly, the decree of the Surrogate's Court, New York County (Renee R. Roth, S.), entered June 29, 2006, which to the extent appealed from, found that Sneha Anne Philip, petitioner's wife, died on September 10, 2004, should be reversed, on the law and the facts, and the petition granted insofar as it seeks a declaration that Sneha Anne Philip's death occurred on September 11, 2001, at the World Trade Center.

MALONE, J. (dissenting). Under the clear and convincing evidence standard required under EPTL 2-1.7 (a), petitioner, as the bearer of the burden of proof, must establish that "it is highly probable that what he . . . has claimed is actually what happened" (*Matter of Cella* [Appeal No. 1], 261 AD2d 870 [1999], *lv denied* 93 NY2d 814 [1999]). In my view, the evidence does not support petitioner's claim that his wife fell victim to the terrorist attacks on the World Trade Center on September 11, 2001. Accordingly, I would affirm the decree declaring Sneha Anne Philip dead as of September 10, 2004, three years after her disappearance.

Petitioner's sole argument on appeal is based on his testimony that his wife was away from their Battery Park City home the night of September 10, 2001 on one of her frequent unannounced overnight absences, and that she always returned home from wherever she went between 7:00 and 9:00 the next morning. Thus, petitioner argues, on September 11, 2001, his wife was "exposed to a specific peril of death" (EPTL 2-1.7 [b]), namely, the terrorist attacks on the World Trade Center. However, as the majority correctly points out, there is no direct evidence tying the decedent to the 9/11 attack and the circumstantial evidence does not allow a clear and convincing inference that she was in fact at the site of the World Trade Center at the time of the attack. Since it is not known where the decedent spent the night of September 10, it requires specula-

tion to say, as petitioner does, that her route home, which was located at 225 Rector Place, southwest of the World Trade Center, took her across or dangerously near the World Trade Center grounds, or that at 8:48 A.M., when the attacks began, she was even in the vicinity of the World Trade Center. Nor can I concur in the majority's reliance upon *Matter of Lafuente* (191 Misc 2d 577 [2002]), which involved an absentee who enjoyed a long-term marriage with his wife, was gainfully employed near the World Trade Center, and was not the subject of a criminal investigation. While the *Lafuente* absentee's predictable morning routine placed him in the North Tower just before it was attacked at 8:48 A.M., the degree of speculation is greater here, where the decedent's morning routine was less predictable, her professional and personal life more unstable, and her connections to the World Trade Center more tenuous. In my opinion, the decedent's plan to visit Windows on the World in the "coming days" or to shop in the World Trade Center mall the morning of 9/11 falls far short of the clear and convincing evidence standard. Indeed, under the evidence presented, which demonstrates that the decedent's close contact with her mother ended abruptly on September 10, 2001, that she has not been heard of or from since that time, and that a diligent search for her was fruitless, it is equally probable, in light of evidence concerning her professional and personal problems, that the decedent died on or about September 11, 2001 by some other unfortunate fate.

MAZZARELLI, J.P., MARLOW and CATTERSON, JJ., concur with SAXE, J.; MALONE, J., dissents in a separate opinion.

Decree, Surrogate's Court, New York County, entered June 29, 2006, reversed, on the law and the facts, the petition granted insofar as it seeks a declaration that Sneha Anne Philip's death occurred on September 11, 2001, at the World Trade Center.