■ LISA C. GREEN, Appellant, v WILLIAM PENN LIFE INSURANCE COMPANY OF NEW YORK, Respondent. [902 NYS2d 542]—

Upon remittitur from the Court of Appeals (12 NY3d 342 [2002]), judgment, Supreme Court, New York County (Harold B. Beeler, J.), entered June 29, 2006, reversed, on the facts, without costs, and the matter remanded for a new trial.

Saxe and Acosta, JJ., concur in a separate memorandum by Saxe, J., as follows: On this appeal we are required to consider the evidence in a case where a man died under circumstances that led the trial court to rule that he committed suicide. On our first review of that determination, we held, by a vote of 3-2, that as a matter of law, the common-law presumption against suicide had not been sufficiently rebutted (48 AD3d 37 [2007]). An appeal to the Court of Appeals followed. The Court of Appeals disagreed with our reliance on the presumption to determine the appeal as a matter of law, observing that "the evidence was strong enough to permit a finding of suicide, though not to require it," and remitted the matter to this Court for exercise of our weight of the evidence review power (12 NY3d 342, 347 [2009]). Following the Court of Appeals' instructions, and conducting a weight of the evidence review, a plurality of this Court now concludes that while there was evidence that *permitted* a finding of suicide (*see id.*), it was not strong enough to outweigh the evidence tending to point to death by means other than suicide, and that therefore a new trial is needed. A third justice concurs with the conclusion that a new trial is necessary, but declines to reach the weight of the evidence issue, concluding instead that the erroneous mid-trial ruling allowing defendant to present expert testimony alone requires a new trial.

Before addressing the evidence, we must first determine the correct standard of review to be applied. While there are cases stating the standard in a variety of ways, not all of which are

reconcilable; the correct standard is, in fact, well established. In *Cohen v Hallmark Cards* (45 NY2d 493 [1978]), the Court of Appeals explained the distinction between appellate review of the weight of the evidence and appellate review of the sufficiency of the evidence; in doing so, it instructed that as to a weight of the evidence review of a nonjury determination, the Appellate Division has the power to make new findings of fact: "In reviewing a judgment of Supreme Court, the Appellate Division has the power to determine whether a particular factual question was correctly resolved by the trier of facts. If the original fact determination was made by a jury, as in this case, and the Appellate Division concludes that the jury has made erroneous factual findings, the court is required to order a new trial, since it does not have the power to make new findings of fact in a jury case. The result is, of course, different *in cases not involving the right to a jury trial, since then the Appellate Division does have the power to make new findings of fact*. In either situation, the determination that a factual finding was against the preponderance of the evidence is itself a factual determination based on the reviewing court's conclusion that the original trier of fact has incorrectly assessed the evidence" (*id*. at 498 [citations omitted and emphasis added]).

It has therefore become well settled that in reviewing a case tried without a jury, the Appellate Division's "authority is as broad as that of the trial court" (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]; *see also* 1 Newman, New York Appellate Practice § 4.03 [5], at 4-26). The Appellate Division "may render the judgment it finds warranted by the facts, taking into account in a close case the fact that the trial judge had the advantage of seeing the witnesses" (*Northern Westchester Professional Park Assoc.*, 60 NY2d at 499 [internal quotation marks and citations omitted]).

Yet, defendant asserts that our review power is more limited here. It suggests that appellate review of nonjury determinations may be either de novo review, which it says is applicable where essentially legal issues were presented at trial, or weight of the evidence review, which it claims is appropriate where the determination under review was based on credibility, and which it characterizes as a more limited type of appellate review (citing *Coliseum Towers Assoc. v County of Nassau*, 2 AD3d 562 [2003]). It reasons that when the Court of Appeals remitted this matter for a "weight of the evidence" review, the Court intended to circumscribe this Court's authority, and preclude a de novo review of the evidence. We reject this reasoning. To the extent some cases characterize weight of the evidence review as

"limited" (*see e.g. id.*), we disagree. The Court of Appeals' remittitur referred to a weight of the evidence review in order to distinguish that type of review from our prior determination, which was made on the law rather than on the facts.

Nor do we accept defendant's suggestion that *Thoreson v Penthouse Intl.* (80 NY2d 490, 495 [1992]) dictates that our only task here is to decide whether the trial court's determination was based on a fair interpretation of the evidence. The *Thoreson* decision concerned an award of punitive damages under Executive Law § 297 (9), and merely recited, without discussion, its agreement with the use of the "fair interpretation of the evidence" standard there. The questions raised in that case did not involve, and the Court neither discussed nor mentioned, the Appellate Division's well established broad authority to make its own findings of fact, as recognized in *Northern Westchester Professional Park Assoc.* (60 NY2d at 499).

Moreover, the *Thoreson* decision specifies that the "fair interpretation" approach applies "*especially* when the findings of fact rest in large measure on considerations relating to the credibility of witnesses" (80 NY2d at 495 [internal quotation marks and citations omitted and emphasis added]). Limiting appellate review to the fair interpretation of the evidence approach may be appropriate where the findings rest predominantly on credibility determinations, because such determinations are entitled to substantial deference. However, it is not appropriate where the trial court's findings rest largely on inferences drawn from established facts and verifiable assertions. In that case, there is no valid rationale for precluding the appellate court from finding facts, as indicated in *Northern Westchester Professional Park Assoc.* (60 NY2d at 499).

Here, although plaintiff's credibility was properly called into question by the trial court in some respects, when the entirety of the evidence is considered, it becomes apparent that the question of whether Mr. Green committed suicide is not logically dependent on findings regarding plaintiff's credibility. That is, our analysis does not turn on whether plaintiff was lying or telling the truth. Rather, this fact-finding determination is based predominately on inferences drawn from established facts such as empty pill vials and prescription dates, objectively verifiable assertions regarding the decedent's conduct shortly before his death, and statements by witnesses whose credibility is not questioned. As to those aspects of plaintiff's testimony in which her credibility is arguably relevant to a finding, those assertions that are appropriately discounted or rejected based upon credibility problems do not have a significant impact on the question of whether Mr. Green committed suicide.

To conclude this preliminary discussion of the proper standard of review, we observe that since the Court of Appeals has already asserted that "the evidence [in this case] was strong enough to permit a finding of suicide, though not to require it" (12 NY3d at 347), there would be little point in further assessment if our task were limited to merely deciding whether the trial court's determination was based on a fair interpretation of the evidence, rather than assessing de novo whether the weight of the evidence supports the determination.

In accordance with the foregoing, the standard of review we will apply here is the de novo weighing of the evidence set forth in *Northern Westchester Professional Park Assoc.*, rather than the more limited approach referred to in *Thoreson*.

Before proceeding to weigh the evidence, we must also clarify defendant's burden of proof. Plaintiff's burden of proof on her claim for the life insurance benefit is satisfied simply by proof of Mr. Green's death, the existence of the life insurance policy, and plaintiff's status as the beneficiary of that policy (*Schelberger v Eastern Sav. Bank*, 93 AD2d 188, 192-193 [1983], *affd* 60 NY2d 506 [1983]). The claim that benefits are not payable because Mr. Green committed suicide constitutes an affirmative defense, which must be proved by defendant insurance company. Any affirmative defense—even one with no applicable presumption to overcome—places the burden of proof of that issue on its proponent (57 NY Jur 2d, Evidence and Witnesses § 164). Here, however, there is an additional burden on defendant. To establish the affirmative defense of suicide, an insurer must overcome a presumption that has been called "one of the strongest presumptions in the law" (*Schelberger*, 93 AD2d at 190). This burden has been said to require the insurer to establish suicide by "clearly establishing such facts as will exclude any reasonable hypothesis of accidental death" (*id.* at 192, quoting Vance, Insurance, at 571). Stated as the pattern jury instruction directs, the finding of suicide may be made only if the finder of fact is satisfied "that no conclusion other than suicide may reasonably be drawn" (PJI 4:57; 1:63.2). The Court of Appeals, in remanding this matter, approved the use of that instruction, although it also rephrased the instruction as one that tells jurors that suicide should not be found "unless the evidence shows suicide to be highly probable" (12 NY3d at 347). We therefore conclude that it is our obligation, just as it was the obligation of the trial court acting as factfinder, to apply the presumption against suicide in connection with defendant's burden of proof on its affirmative defense, so as to find against suicide unless "no conclusion other than suicide may reasonably be drawn" (PJI 4:57) or

"the evidence shows suicide to be highly probable" (12 NY3d at 347).

With these parameters in mind, we turn to the evidence.

As alluded to earlier in this discussion, we acknowledge, and to an extent agree with, the trial court's view that in some respects plaintiff's trial testimony was not credible. Initially, we note that where the trial court questioned plaintiff's credibility based *not* on her courtroom demeanor—which this Court cannot observe and therefore could not rely on to question credibility—but on statements she is reported by others to have made shortly after her husband's death, this Court is also capable of independently assessing plaintiff's credibility on that basis. Moreover, we would closely question plaintiff's credibility in any event, given her pecuniary interest in the matter.

The portion of plaintiff's testimony that warrants rejection on credibility grounds is the part in which she protested that her husband had not been depressed at the time of his death. This assertion was directly contradicted by her reported statements to police and to her sister-in-law on the day of Mr. Green's death and the next day, that he had been depressed and that he must have overdosed on his medications. Moreover, the fact of Mr. Green's depression was established by the unassailable testimony of his internist, Dr. Robert Bos, with whom he spoke the day before his death.

However, while plaintiff's unwillingness to acknowledge at trial her husband's emotional difficulties may provide reason for rejecting her assertions on credibility grounds, it does not provide a basis to make affirmative findings of fact against her on the issue on which her adversary has the burden of proof, that is, that Mr. Green committed suicide. It is up to defendant to present evidence compelling that finding.

In an effort to establish that it has made such a showing, defendant characterizes as admissions plaintiff's expressions of fear, at the scene and shortly thereafter, that her husband must have died of a drug overdose. However, plaintiff's expressed fear or suspicion that her husband took an overdose of medication is not an admission of anything. Plaintiff's statements may not logically be relied on either to establish the *actual* cause of his death or his intent at the time. Her expressions of fear or suspicion could satisfy defendant's burden of proving that the feared possibility was a fact only if it were shown to be based on facts or events known to plaintiff and established at trial, that objectively support the conclusion that suicide, rather than accidental or unintentional death, was highly probable.

Another problem with the trial court's finding that Mr. Green

committed suicide is that the court improperly allowed, and then placed excessive reliance on, the testimony of defendant's belatedly offered expert, forensic pathologist Dr. Michael Baden, when it found that "[t]he presence of suicidal thoughts in an individual is an important factor in determining whether the death of that individual was as a result of a suicide. The fact that an individual had been depressed in the immediate period before death is an important factor in determining whether the death of that individual was the result of suicide; and many suicides can be the results of acute reactive depressions which result from personal financial problems of a few days' duration." Dr. Baden had asserted that depression and suicidal thoughts are very important factors in making a diagnosis of suicide and that most suicides are not planned but are committed on the basis of opportunity.

Under the specific circumstances presented here, the ruling allowing defendant to present this testimony constituted an abuse of discretion.

CPLR 3101 (d) (1) provides that a party shall not be precluded from introducing an expert to testify at trial despite noncompliance with the statute's notice requirement *where the party has shown good cause for the belated application*. The requirement of showing good cause has been considered satisfied where testimony offered by a witness at trial was entirely new and came as a surprise, such as in *Simpson v Bellew* (161 AD2d 693 [1990], *lv denied* 77 NY2d 808 [1991]), a personal injury action involving a pedestrian hit and killed by a van, in which a police officer called by the defendant testified for the first time at trial that the driver of the van told him that he had hit the pedestrian in the crosswalk, although no such admission had been noted in his police report. The surprise testimony not only was completely new, but it also was the type of information that would rationally be expected to be included in the police report, so the officer's failure to report it before testifying at trial necessitated a new witness on the subject. In contrast, here, notwithstanding the defense's characterizations, Dr. Bos's testimony at trial contained nothing new.

While a trial court has wide discretion to allow a party to introduce expert testimony despite its failure to give the other side proper notice pursuant to CPLR 3101 (d) (*see e.g. Putchlawski v Diaz*, 192 AD2d 444, 445 [1993], *lv denied* 82 NY2d 654 [1993]), *in the absence of prejudice* (*see St. Hilaire v White*, 305 AD2d 209, 210 [2003]), here, the lack of prior notice of Dr. Baden's testimony prejudiced plaintiff by leaving her unable to properly counter that testimony. Plaintiff should have been

entitled to rely on the absence of notice of a defense expert to conclude that she need not retain or consult her own expert beyond her husband's treating physician, Dr. Bos.

One reason it is so troubling that plaintiff was prejudiced in this manner is that the situation defense counsel was attempting to solve with his sudden introduction of an expert witness was of his own making. It arose from defense counsel's litigation decision to use Mr. Green's treating internist, Dr. Robert Bos, on his direct case to establish that Mr. Green had been suicidal. Plaintiff did nothing to create the predicament in which the defense found itself. Since the burden was always on defendant to overcome the presumption and prove that Mr. Green committed suicide, and plaintiff had no burden on the issue, defendant cannot possibly point to plaintiff's not calling an expert to justify defendant's initial decision not to call its own expert.

Moreover, the defense's decision to prove through Dr. Bos that Mr. Green had been suicidal relied on a rather broad view of Dr. Bos's deposition testimony. Dr. Bos testified at his deposition that Mr. Green said he had "suicidal thoughts," but he further testified that Mr. Green immediately assured him that he did not want to kill himself, did not have plans to do so, and would never do such a thing.

Contrary to defense counsel's characterization in the context of the mid-trial application to call Dr. Baden as a witness, Dr. Bos's testimony at trial was not inconsistent with his deposition testimony. He testified at trial that Mr. Green "may not have cared about being alive at that point," used words to the effect that he "[did not] feel life [was] worthwhile" and may have said he did not "see . . . the point of being alive." Dr. Bos explained that it was based on such statements by Mr. Green that he made the notation "suicidal thoughts" in his records, but he explained how he differentiated between suicidal statements or thoughts and the state of actually being suicidal.

The purported contradictions defense counsel relied on in making the mid-trial application were not substantive contradictions and provided no actual support for the application. Defense counsel cited Dr. Bos's failure to testify at trial that Mr. Green said he did not see the point of living, although he testified to that effect at his deposition. However, Dr. Bos's trial testimony was virtually indistinguishable from his deposition testimony; to the extent he omitted mentioning at trial any particular statement attributed to Mr. Green at deposition, no direct contradiction was made out. Nor did Dr. Bos testify at trial, as defense counsel claimed, that "suicidal thoughts do[ ] not mean anything." Rather, at both deposition and trial he discussed the

statements Mr. Green made to describe how he then felt about his life.

Nor do defense counsel's arguments on the present appeal support the claim that Dr. Bos changed his testimony, thereby making it necessary for the defense to call a new expert witness. The record does not support defendant's contention that Dr. Bos tried to "distance himself" from his earlier testimony characterizing Mr. Green as having suicidal thoughts, based on Mr. Green's statement that he did not see the point of living.

The defense's assertion that "Dr. Bos testified at trial that suicidal thoughts, without a plan to implement them, do not present a serious warning" is a distortion of the trial testimony. When we consider the testimony itself, as well as the manner in which it was elicited, it is clear that it cannot properly support a ruling allowing defense counsel to present a surprise expert witness. What occurred was that on redirect examination of Dr. Bos, defense counsel attempted to press its point that Mr. Green's "suicidal thoughts" reflected that he was a suicide risk, by asking Dr. Bos a question more suited to an expert witness than to a fact witness. Specifically, defense counsel asked, "In somebody who is depressed, and . . . having suicidal thoughts, does that person present the same risk for suicide as a person who is depressed but is not having suicidal thoughts?" Dr. Bos replied that merely questioning the purpose of daily life does not, in itself, mean that a depressed person is going to take his own life. He added that it is "when they express to you a plan, and a concrete plan of really ending it all, then that would establish suicidality."

While defense counsel clearly found this unexpected answer unsatisfactory, his unhappiness with Dr. Bos's responses did not justify the court's allowing him to bring in an expert in midtrial. Dr. Bos's answer did not contradict his earlier testimony. Rather, counsel asked him at trial a question he had not been asked before, and then did not like the answer. Moreover, since that portion of Dr. Bos's testimony was elicited by defense counsel on a point not raised at deposition, on a subject more suited to an expert witness than to a fact witness, counsel should not have been permitted to rely on the unexpected answer to support his claim that he suddenly needed a new expert.

We also reject the suggestion of our dissenting colleague that the belated introduction of Dr. Baden was justified because Dr. Bos had purposely attempted to "weaken the implication that Mr. Green had committed suicide" by his testimony that merely questioning the purpose of life does not mean that a depressed person is going to take his own life. Dr. Bos was simply provid-

ing a fuller, more balanced and more nuanced answer to defense counsel's question than the simple response counsel seemed to expect.

Finally, the minor discrepancies in Dr. Bos's testimony as to who first told him over the telephone after Mr. Green's death that Mr. Green had taken pills in a manner suggesting suicide fail to justify any relief. Indeed, while Dr. Bos expressed some uncertainty on this general subject, after his recollection was refreshed, he clarified that it was plaintiff who told him about the empty pill vial and the possibility of suicide.

In view of plaintiff's objection, the trial court should not have allowed defendant to present a new expert at that juncture. It was fundamentally unfair to allow the defense to bring in an expert witness in mid-trial when the sudden need for expert testimony was created by the defense's strategic decision to attempt to establish through Mr. Green's treating physician, a fact witness, a general truth about suicidal people, and that decision backfired.

The prejudice plaintiff experienced as a result of the surprise introduction of an expert in mid-trial was not eliminated by the offer of time for plaintiff to obtain a competing expert. In the midst of trial, attempting that task would entail an unacceptable diversion of counsel's attention; as a practical matter, plaintiff's counsel could not undertake the task of locating a new expert to challenge Dr. Baden's opinions and assertions as part of a rebuttal case. Counsel's decision to decline the illusory offer of time was simply realistic, and should not be interpreted to mean that plaintiff was not prejudiced.

The ruling admitting Dr. Baden's testimony is especially problematic because the trial court relied on it so heavily, particularly with regard to a questionable assertion by the expert that most suicides are not planned and are committed on the basis of opportunity. In fact, contrary to earlier research suggesting that many suicides are the result of impulsive decisions, recent research establishes that most suicides are *not* attempted impulsively, but involve a plan (*see* April R. Smith, Tracy K. Witte, Nadia E. Teale, Sarah L. King, Ted W. Bender and Thomas E. Joiner, *Revisiting Impulsivity in Suicide: Implications for Civil Liability of Third Parties*, 26 Behav Sci & L 779 [Nov./Dec. 2008]). Nor was any explanation offered for permitting a forensic pathologist to testify as an expert on the psychology or state of mind of an individual who commits suicide. The resulting finding of suicide is particularly troubling, in the absence of evidence here tending to show any suicide plan on Mr. Green's part, insofar as it was so heavily based on this

surprise expert testimony that plaintiff was unable to effectively controvert.

Dr. Baden's testimony must therefore be excluded in its entirety from the evidence to be considered in determining whether the verdict is supported by the weight of the evidence. Because that testimony provided by far the strongest evidentiary support for the finding that Mr. Green had committed suicide, and the remaining evidence consists largely of surmise, once this testimony is excluded from consideration, justification for the verdict is substantially undermined.

Even if we found that permitting Dr. Baden to testify did not constitute an abuse of discretion, we would nevertheless find that the trial court placed excessive reliance on his testimony, and in our present independent weighing of the evidence, we would, in any event, find that Dr. Baden's testimony is entitled to little weight.

Another important component of the trial court's finding of suicide was the inference the court drew from the empty pill vials that had contained Ambien and hydrocodone. The court calculated, based on the time it had taken Mr. Green to finish the prescription for 30 Ambien pills that he received on December 8, 2001 and refilled on February 6, 2002, that the amount of medication that would have been in the vial on the day he died was "inconsistent with an accident and only consistent with the fact that it was a deliberate suicidal act." It further relied on the possibility that Mr. Green also took some of the 40 hydrocodone pills that had been prescribed for him in January after hernia surgery.

In our view, however, the conclusion that Mr. Green intentionally took an overdose of these two pills is based upon conjecture and is not sufficiently supported by the record. As to the painkiller hydrocodone, there is no basis for the conclusion that *any* of it remained in its vial by the date of his death, since it had been prescribed 27 days earlier and, if taken at anything like the prescribed rate of two every four hours, all 40 pills would have been taken well before that date. As to the Ambien, we simply cannot say how many pills remained in the Ambien vial by that date. Mr. Green's earlier use of 30 Ambien pills during a previous 60-day period may be relevant, but cannot be relied upon by itself to establish as a fact his usage during the weeks preceding his death. Importantly, plaintiff said that Mr. Green took the Ambien regularly and that if he woke in the middle of the night, he took another pill or half a pill. She also admitted to having taken approximately five of the Ambien pills herself. This described usage could have left the vial empty or

nearly empty on the date in question, without enough Ambien to cause death. But even if we do not credit plaintiff's description of how the Ambien was used, the mere fact that Mr. Green had been given 30 Ambien pills two weeks before his death creates, at best, a mere possibility that he had enough pills to overdose on them, not a circumstance that establishes a deliberate suicidal act.

Parenthetically, it seems perverse, to say the least, that a court would give greater credence to the contention that a drug addict who overdosed did so accidentally than to the suggestion that a nonaddict may have overdosed accidentally, as the trial court seemed to do in reliance on *Schelberger v Eastern Sav. Bank* (93 AD2d 188 [1983], *supra*).

Finally, the trial court acted improperly to the extent it determined that plaintiff was incredible based on the perceived inconsistency between her refusal to permit a toxicological exam or an autopsy of Mr. Green's body on religious grounds and her arranging for Mr. Green's remains to be cremated in accordance with his stated wishes, which the court asserted was in violation of those same religious tenets. It is presumptuous to term these two decisions inconsistent in support of a determination that plaintiff is not credible. Jews vary widely in their observance of Jewish law; while some attempt to strictly follow all 613 mitzvot in the Torah, others abide by far fewer. Each Jew makes an independent choice as to which of the mitzvot he or she will live by. There is nothing suspect in a Jewish person's unwillingness to abide by particular tenets of Jewish law, and the decisions that person makes do not permit others to call into question that person's character, sincerity or credibility. It is improper to find a Jewish person unworthy of belief simply because the person abides by some aspect of Jewish law but not another. This is what the trial judge did, and this is what Justice Andrias does as well. And, when the credibility determination based on the so-called inconsistency is examined in the sunlight and seen for what it is, a substantial chunk of the trial court's findings falls away.

Moreover, the two decisions are not necessarily logically inconsistent. A Jew may express, while alive, a wish for his body to be cremated, without expressing any wish or preference concerning autopsies or toxicological exams. In such circumstances, after that individual's death, the surviving relatives may feel bound by his expressed wish to be cremated, but, in the absence of any other direction about how his body should be treated, may feel authorized to make any remaining decisions based on *their own* views and observances.

The purported inconsistency therefore ought not serve as a basis for any sort of negative inference.

Nor is it appropriate to make a finding of suicide based on the conclusion that plaintiff sought to avoid the postmortem testing because she feared that an overdose would be discovered. The trial court reasoned that plaintiff did not permit the procedures because she "didn't really want to find out" or was afraid of finding out that her husband did, in fact, commit suicide. However, this reasoning employs the same fallacy as defendant's reliance on plaintiff's statements of fear that her husband had died of an overdose of his medications. Plaintiff's fear that her husband had committed suicide, and her purported desire to avoid having that fear confirmed, does not justify the inference that he committed suicide. It establishes neither the fact of an overdose nor that any such overdose was intentional rather than accidental.

We also reject defendant's argument that plaintiff's refusal to consent to an autopsy or toxicological exam could not have been motivated by religious tenets, because if she had wanted to respect the family's wishes, she would have consulted Mr. Green's adult son or his sister, rather than his cousin. Nothing in the testimony reflects that Mr. Green was closer with his adult son or his sister than he was with his cousin, while there *is* evidence that Mr. Green and his cousin were close.

In addition, I find it objectionable that my colleague seems to implicitly draw a negative inference from plaintiff's failure to change her mind and grant permission for an autopsy and toxicology after the Deputy Medical Examiner advised her that it might be hard to collect on a life insurance claim in the absence of test results as to the cause of death. There is no reason why plaintiff should have reconsidered her decision based on the suggestion or advice of a medical examiner. In this context, my colleague also seems to imply that there was something untoward about the input of Mr. Green's cousin, whom he refers to as "attorney Wolff," in plaintiff's decision to refuse an autopsy and toxicology. It seems as though the term "attorney" is intended to raise the spectre of connivance and obfuscation. Any such implication is without any basis, however; the only evidence on the point shows Mr. Green to have been close to Mr. Wolff, which makes plaintiff's consultation with him nothing but appropriate.

Besides rejecting many of the underpinnings of the trial court's finding of suicide, we observe that, notwithstanding the doubt cast on some of plaintiff's testimony, there is no reason to reject, and much evidentiary support for, plaintiff's testimony

recounting her husband's conduct on the morning of February 20, 2002, the day of his death. Indeed, the trial court accepted as fact plaintiff's assertions that Mr. Green told her that he would be going to the gym that morning and that he had to make telephone calls, including a work-related conference call, that afternoon. Those assertions are confirmed by the fact, also found by the trial court, that when she found him on the bed that evening, he was dressed in gym clothes—jeans, t-shirt and sweatshirt, with his sneakers on the floor next to the bed. Additionally, Mr. Green's cousin, Richard Wolff, who was representing Mr. Green in litigation with his former employer, testified that he spoke with Mr. Green that morning, and that they scheduled a meeting for the following week. According to Mr. Wolff, Mr. Green was upbeat, positive and excited about the consulting business he had begun.

Furthermore, the testimony of Dr. Bos reflects that while Mr. Green was experiencing emotional difficulties, he was not overcome by them. Dr. Bos, upon hearing Mr. Green acknowledge that he was experiencing depression, anxiety and insomnia, directly inquired as to whether Mr. Green felt suicidal, and Mr. Green replied without qualification that "he would never do such a thing, he was not suicidal, he was just down." We also observe that by going to the trouble of following up on his internist's referral to a psychiatrist, with whom he left a voicemail message, Mr. Green demonstrated that he recognized, but refused to succumb to, his current state of depression.

The inference that Mr. Green's death was unintended is further supported by additional facts as found by the trial court, including Mr. Green's actions shortly before his death, such as contacting a psychiatrist, and the items found surrounding him at the time of his death, including a copy of the New York Times, his Palm Pilot and his portfolio. All these items, conversations and appointments point to a man engaged in life, not one determined to depart it.

As plaintiff reasonably suggested at trial, there are a variety of possible reasonable explanations for her husband's death: It might have been caused by any number of sudden events such as a heart attack, an aneurysm, or an adverse reaction to medication. And if it was an overdose, it could just as easily have been accidental rather than intentional.

Weighing anew the entirety of the evidence, we find that the evidence tending to permit an inference of suicide is not sufficiently substantial to outweigh the strong presumption against suicide. We find suicide to be merely one possible cause of Mr. Green's death but far from the only reasonable conclusion to

reach. The presumption against suicide not being overcome, the weight of the evidence does not support the trial court's finding, and a new trial is appropriate (*Cohen v Hallmark Cards*, 45 NY2d 493, 498-500 [1978], *supra*).

We recognize, of course, that only two members of this bench explicitly rule that the reversal we order should be based on the weight of the evidence; the concurring justice, declining to address the weight of the evidence, bases his determination that reversal is necessary on the improper introduction of an expert witness in mid-trial. However, it should not escape notice that the concurring justice has implicitly agreed with that portion of our plurality opinion which concludes that two important components of defendant's case must be excluded when this court weighs the evidence. First, the conclusion that it was error to permit Dr. Baden's testimony logically requires Dr. Baden's testimony to be removed from the balance sheet. Second, by agreeing that plaintiff's expressions of her fears or beliefs with regard to how her husband died do not constitute affirmative proof of how he died, our colleague's opinion precludes reliance on that testimony to support defendant's claim of suicide. I submit that, even ignoring the other errors, simply removing those two components of defendant's evidence from the balance sheet, particularly considering the centrality of Dr. Baden's testimony, supports our factual finding that what remains is a puny quantum of evidence insufficient to overcome the ancient common-law presumption against suicide.

Accordingly, the judgment of the Supreme Court, New York County (Harold B. Beeler, J.), entered June 29, 2006, dismissing the complaint after a nonjury trial, reversed, on the facts, without costs, and the matter remanded for a new trial.

McGuire, J., concurs in a separate memorandum as follows: For the reasons stated by Justice Saxe, I agree that we should direct a new trial because Supreme Court erred in granting defendant's mid-trial application to have Dr. Baden testify as an expert witness. In my view, the court abused its discretion in granting the application. In any event, I would substitute our discretion for that of Supreme Court and hold that Dr. Baden should not have been permitted to testify (*see Brady v Ottaway Newspapers*, 63 NY2d 1031 [1984]). As a new trial is necessary for this reason alone, there is no need to reach the issue of whether the verdict is against the weight of the evidence. But because there will be a new trial, I add that I also agree with Justice Saxe to the extent he concludes that the evidence concerning expressions by plaintiff of a fear or belief that her husband committed suicide are not affirmative evidence that he

did commit suicide and that Supreme Court gave undue weight to that evidence.

I disagree with Justice Saxe's view that I have "implicitly agreed with" him in two particular respects. My conclusion that Dr. Baden should not have been permitted to testify does not "logically require[ ] Dr. Baden's testimony to be removed from the [weight-of-the-evidence] balance sheet." First, evidence that should not have been admitted at trial is nonetheless evidence that was admitted at trial. Justice Saxe cites no authority for the proposition that when the weight of the evidence is assessed we must disregard evidence that was considered by the trier of fact on the ground that it should not have been admitted. In a criminal case, I think it plain that, for example, if we were to determine that an inculpatory statement of the defendant admitted at trial should have been suppressed, we would not appraise either the sufficiency or the weight of the evidence as if the statement had not been admitted. Nor can we assume there are no circumstances under which Dr. Baden (or another expert) might testify at the new trial. Second, the evidence relating to plaintiff's expressions of her fears or beliefs with regard to how her husband died may be admitted for impeachment purposes even though they are not substantive proof of how he died (*see generally Barnes v City of New York*, 44 AD3d 39, 47 [2007, Sullivan, J.], *lv denied* 10 NY3d 711 [2008]). To that extent, my opinion does not "preclude reliance on that [evidence] to support defendant's claim of suicide."

Andrias, J.P., and Nardelli, J., dissent in a memorandum by Andrias, J.P., as follows: In this action by the widow of Alan Green, deceased, to recover the proceeds of his life insurance policy, the complaint was dismissed, after a nonjury trial, based on a finding that there was no reasonable explanation for Mr. Green's death other than suicide. On appeal, we reversed and directed, by a vote of 3-2, the entry of judgment for plaintiff on the ground that "the evidence failed as a matter of law to overcome the presumption against suicide" because "there are other reasonable conclusions that may be drawn [therefrom], aside from suicide" (48 AD3d 37, 44, 40 [2007]).

The Court of Appeals, stating that the presumption against suicide "is a guide for the factfinder, not a rule that compels a result," and that the jury instruction approved in *Schelberger v Eastern Sav. Bank* (60 NY2d 506 [1983]) "should not be taken to mean that, where more than one conclusion is reasonably possible, suicide is excluded as a matter of law," reversed our determination "[b]ecause there was evidence legally sufficient to support Supreme Court's decision [that Mr. Green committed

suicide]" (12 NY3d 342, 345, 347 [2009]). The matter was then remitted to this Court "for consideration of the facts and issues raised but not determined on the appeal to [this] Court." (*Id.* at 347.)

The plurality, employing a de novo review, would again reverse the judgment in defendant's favor and remand for a new trial on the grounds that the finding that defendant committed suicide is against the weight of the evidence and that the trial court improvidently allowed Dr. Michael Baden, a forensic pathologist, to testify as a defense expert. The concurrence agrees that Dr. Baden's testimony should not have been admitted and would reach no other issue. Because I believe that allowing Dr. Baden to testify was not an improvident exercise of discretion and that the trial court's finding of suicide, based largely on its credibility determinations, is not against the weight of the evidence, a fair interpretation of which, when viewed as a whole, shows Mr. Green's suicide to be highly probable, I would affirm the judgment dismissing the complaint.

On December 3, 2001, defendant issued a $500,000 policy insuring the life of Mr. Green, age 54. On February 20, 2002, plaintiff, Mr. Green's wife, returned from work to find Mr. Green lying dead on their bed. When she requested payment as the policy's primary beneficiary, defendant invoked a policy clause that provided that if Mr. Green died as a result of suicide within two years of the date of issue, the death benefit would be limited to the return of the premiums. This action ensued and a bench trial was held in 2005.

The record reflects that Mr. Green resigned his employment in August 2001 and formed a venture to provide information technology consulting services. A restrictive covenant, the enforceability of which he was litigating, prevented Mr. Green from soliciting his former employer's customers for two years, and he did not earn any income from the new venture or from any other employment from the date of his resignation to the date of his death. In September 2001, Mr. Green was unable to pay the initial $318.50 premium due with the application for his new life insurance policy, so plaintiff paid it. Mr. Green also borrowed $30,000 from plaintiff to meet his child support obligations from an earlier marriage.

The day before he died, Mr. Green saw Dr. Bos, who was treating him for pain related to a January 2002 hernia surgery. Mr. Green, a nonsmoker and regular exerciser who took good care of his health, did not complain of pain related to the surgery and was found to be in excellent health during that examination and in those performed in the months before he died.

Mr. Green told Dr. Bos that he was depressed, out of work, feeling under lots of pressure and suffering from insomnia. He also said words to the effect that he didn't see "the point of being alive," which Dr. Bos interpreted as Mr. Green's having suicidal thoughts. However, Mr. Green said he had no suicidal plans and Dr. Bos's notes indicate that Mr. Green had "suicidal thoughts" but was "[n]ot suicidal." Dr. Bos found that Mr. Green had "reactive depression" and referred him to a psychiatrist. Mr. Green called the psychiatrist that day and left a message for the psychiatrist to return the call.

Richard Wolff, Mr. Green's cousin, represented Mr. Green in the employment litigation. On the morning of his death, Mr. Green told attorney Wolff that he "hurt[ ] like hell" due to his hernia surgery, and they scheduled a meeting for the following week. According to Wolff, Mr. Green was upbeat, positive and excited about the consulting business he had begun and his life in general. However, after he resigned from his job, Mr. Green had told Wolff that he was under financial pressures in connection with his child support obligations.

On the morning of his death, Mr. Green told plaintiff that he was going to the gym to swim. When plaintiff returned home that evening, she found Mr. Green lying on the made bed wearing jeans, a T-shirt and a sweatshirt. An empty glass was on the nightstand beside him, and the New York Times, work papers and a Palm Pilot were on the bed next to him. When plaintiff could not awaken Mr. Green, she called 911 and emergency medical services (EMS) personnel responded. Plaintiff's mother and sister-in-law and Wolff also came to the apartment. EMS personnel pronounced Mr. Green dead at the scene. No suicide note was found. Mr. Green had no history of mental illness or known previous suicide attempts.

On the night of Mr. Green's death, plaintiff told a police officer that Mr. Green had been "depressed[,] and overdosed on pain medication." She also told a representative of the Office of the Chief Medical Examiner that Mr. Green had been depressed and unemployed. Plaintiff, after consulting with attorney Wolff, refused to permit an autopsy or toxicological exam to be conducted by the Medical Examiner's office, claiming it violated Jewish religious law and the family's wishes. Plaintiff and Wolff adhered to this decision despite being told by a Deputy Medical Examiner that in the absence of proof of the cause of death, plaintiff might have difficulty with any later insurance claim. Although cremation is prohibited by Jewish law, plaintiff allowed Mr. Green to be cremated. According to plaintiff, this was because Mr. Green had requested before his death that he be cremated and his ashes scattered over Yankee Stadium.

On December 8, 2001, Mr. Green had received a prescription for 30 Ambien pills, which he refilled on February 6, 2002, two weeks before his death. In January 2002, Mr. Green had filled a prescription for 40 hydrocodone pills for pain following his hernia surgery; that prescription was not refilled. The empty vials for the Ambien refill and hydrocodone were found by the Medical Examiner's office at the scene. The Medical Examiner's office also found a vial containing 61 Vicodin pills and an empty vial from a prescription for Percocet previously issued to plaintiff.

On the evening of Mr. Green's death, plaintiff spoke to Dr. Bos and indicated that "pills were missing," which suggested to Dr. Bos that Mr. Green may have committed suicide by taking the pills. Plaintiff told her sister-in-law the next day that pills were involved in Mr. Green's death and that he had been depressed as a result of financial problems and had recently cancelled Valentine's Day plans due to depression. Plaintiff implored her sister-in-law not to tell one of Mr. Green's friends, a dentist, anything about the pills. Plaintiff testified at trial, inconsistently, that she and Mr. Green might have taken all the pills in normal doses over a period of weeks preceding his death.

The death certificate lists the cause of death as "undetermined." Plaintiff testified that she did not know what caused Mr. Green's death, but speculated that it might have been a heart attack, an aneurysm or an adverse reaction to medication.

On direct examination, Dr. Baden testified that depression and suicidal thoughts are very important factors in evaluating whether a death is suicidal or not, and are particularly significant in the absence of an admitted plan to commit suicide, since most suicides are not planned and are committed on the basis of opportunity. He also testified that the ingestion of 10 10-milligram Ambien pills or 20 5-milligram hydrocodone pills would be sufficient to cause death and that Vicodin would still be effective two years after it was prescribed.

On cross-examination, Dr. Baden testified, among other things, that pathologists usually determine whether a person committed suicide through an autopsy or toxicology study, by reviewing the decedent's history and circumstances, and by excluding other competing causes. Although he could not tell how many pills Mr. Green had taken because there was no autopsy, Dr. Baden believed that Mr. Green committed suicide because he was depressed and the medical records showed no other condition that would have caused his death. Dr. Baden explained that medical examiners deal with "acute reactive depressions," i.e. someone "reacts to something going on in his

life," which can lead to suicide even "after one or two days of such thoughts." While acknowledging that no suicide note was found in this case, Dr. Baden testified that suicide notes are found in only approximately 25% of cases where suicide is later determined to have been the cause of death.

Consistent with this evidence, the trial court found that the facts that an individual had suicidal thoughts and "had been depressed in the immediate period before death" were "important factor[s] in determining whether the death . . . was the result of suicide; . . . [that] many suicides can be the results of acute depressions . . . result[ing] from personal financial problems of a few days['] duration"; that Mr. Green "was suffering from depression at the time of his death and many people commit suicide without a plan as the result of acute reactive depression"; that "[a] toxicological examination . . . would have established whether [Mr. Green's] death was the result of an overdose of medication"; that "[a]n autopsy . . . would have established the cause of death even more definitively than a toxicological examination and would have determined whether [Mr. Green's] death . . . was as a result of an overdose of medication [or] the result of some other medical condition or . . . natural cause"; and that Mr. Green's "medical records [did] not establish that [he] was suffering from any other condition which would have caused him to die of natural causes."

In its conclusions of law, the trial court found that plaintiff made out a prima facie case by producing the life insurance policy and proof of Mr. Green's death, which shifted the burden to defendant to prove that Mr. Green committed suicide. Guided by the pattern jury instruction approved by the Court of Appeals in *Schelberger v Eastern Sav. Bank* (60 NY2d 506 [1983], *supra*), the trial court concluded that defendant met its burden of overcoming the presumption against suicide because there was no "reasonable explanation in this case [for Mr. Green's death] other than suicide"; it was "pure speculation that his death was as a result of natural causes"; and "[t]he amount of medication taken is inconsistent with an accident and only consistent with the fact that it was a deliberate suicidal act." In so ruling, the court noted that, unlike the decedent in *Schelberger*, Mr. Green was not a drug addict who had previously overdosed on drugs.

Initially, I disagree with the plurality about the applicable standard of review. It is true that this Court's authority in reviewing the evidence in a nonjury trial is as broad as that of the trial court and that we may render any judgment we find "warranted by the facts, taking into account in a close case 'the

fact that the trial judge had the advantage of seeing the witnesses' " (see *Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983], quoting *York Mtge. Corp. v Clotar Constr. Corp.*, 254 NY 128, 134 [1930]). However, it is well settled that in exercising this power, where the findings of fact rest in whole or in part upon considerations relating to the credibility of the witnesses, we should not disturb the decision of the trial court "unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence" (*Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992] [internal quotation marks omitted]; *Kermanshah Oriental Rugs, Inc. v Latefi*, 51 AD3d 562, 563 [2008]; *Bragdon v Bragdon*, 23 AD3d 203 [2005]).

Here, the trial court, in determining whether the only reasonable inference to be drawn from the evidence was suicide, expressly stated that it was "of course taking into account the *critical factor* of the credibility of the witnesses" (emphasis added). Still, the plurality contends that de novo review is warranted and that *Thoreson*'s fair interpretation of the evidence approach is inapplicable because "the question of whether Mr. Green committed suicide is not logically dependent on findings regarding plaintiff's credibility" but rather is "based predominately on inferences drawn from established facts such as empty pill vials and prescription dates, objectively verifiable assertions regarding the decedent's conduct shortly before his death, and statements by witnesses whose credibility is not questioned." This position cannot withstand scrutiny.

In an action to recover on a life insurance policy, the presumption against suicide applies for the duration of the case, and the burden of proof of suicide is on the insurer (see *Schelberger v Eastern Sav. Bank*, 60 NY2d 506 [1983], *supra*; *Wellisch v John Hancock Mut. Life Ins. Co.*, 293 NY 178 [1944]). However, even "where more than one conclusion is reasonably possible, suicide is [not] excluded as a matter of law," since "[e]xcept in rare cases, a claim of suicide presents a factual issue, not a legal one" (*Green v William Penn Life Ins. Co. of N.Y.*, 12 NY3d 342, 347 [2009], *supra*). Further, as to the burden of proof, the Court of Appeals has explained that "[t]he [pattern jury] instruction [approved in *Schelberger*] that a finding of suicide is permissible only when 'no conclusion other than suicide may reasonably be drawn' is directed at jurors deciding facts, not at judges deciding the law; it is a way of impressing on jurors' minds that the presumption against suicide is a strong one—of telling them they should not find suicide unless the evidence shows suicide

to be highly probable. Of course, the same is true of a judge sitting as factfinder in a nonjury trial." (*Id.*)*

A "highly probable" burden of proof may be satisfied by circumstantial evidence (*see Matter of Philip*, 50 AD3d 81, 82-83 [2008]; *Maier v Allstate Ins. Co.*, 41 AD3d 1098, 1099-1100 [2007] [the standard of proof in civil arson cases is "clear and convincing," and the insurer may prove the elements of motive and opportunity by circumstantial evidence]). Circumstantial evidence is sufficient if a party's conduct may be reasonably inferred from it (*see Gayle v City of New York*, 92 NY2d 936 [1998]; *Benzaken v Verizon Communications, Inc.*, 21 AD3d 864, 865 [2005]; *see* PJI 1:70).

Because there was no autopsy, toxicological report or eyewitness, no direct evidence of the cause of Mr. Green's death exists, and plaintiff's beliefs, as well as those of his family and friends, are relevant in determining whether it is "highly probable" that he committed suicide. As the trial court found, while plaintiff is not a doctor, this is not simply a medical issue, and plaintiff's observations of Mr. Green around the time of his death and her belief that he committed suicide by overdosing on missing pills have probative value.

In weighing the beliefs of plaintiff and other witnesses, the trial court's findings of fact strongly relied on inferences drawn from circumstantial evidence, including evidence of Mr. Green's motive for committing suicide and the availability of a sufficient quantity of pills to cause his death. This, in turn, rested largely on the trial court's credibility determinations, including the finding that "in many ways Mrs. Green, the plaintiff, was not credible."

In particular, the trial court found that plaintiff's testimony that Mr. Green was not really depressed or under real pressure before his death was incredible because it conflicted with her statements to third parties shortly after Mr. Green's death that, among other things, he was depressed and out of work, that pills were missing and that Mr. Green overdosed on prescription medication. This credibility finding goes directly to the material issues of whether Mr. Green had a motive to commit suicide and whether a sufficient number of pills was available to cause his death.

As to the latter, the trial court found that there had been a sufficient number of pills available in the apartment on Febru-

---

* The Court of Appeals found that in this case "the evidence was strong enough to permit a finding of suicide, though not to require it" (12 NY3d at 347).

ary 20, 2002 to cause Mr. Green's death. The court reasoned that because Mr. Green's first prescription for 30 Ambien pills "lasted approximately 60 days . . . [t]here is no reason to believe the 30 [Ambien] pills that were prescribed [two weeks before his death] would have lasted any longer or any shorter than" that. While the trial court did not specify an exact number, at the rate of one pill every two days, Mr. Green would have used only seven Ambien pills in the 14 days after the prescription was issued, leaving approximately 23 pills available on the date of his death. Indeed, even if Mr. Green had taken one Ambien pill per day, a dosage twice as much as was reflected in his earlier usage of 30 pills in 60 days, there would have been approximately 16 pills left in the vial on February 20, 2002. Based on the unrebutted expert testimony at trial, either amount supports the inference that there was a sufficient number of Ambien pills available on February 20, 2002 to cause Mr. Green's death. The trial court also noted that an empty vial of hydrocodone and a vial containing 61 Vicodin pills were found.

The plurality deems this finding to be conjecture. As to the hydrocodone, it maintains that there is no basis to find that any pills would have remained on the date of Mr. Green's death because the hydrocodone was prescribed 27 days earlier and would have been finished if taken at the prescribed rate. As to the Ambien, the plurality relies on plaintiff's testimony as to her and Mr. Green's alleged usage beyond the prescribed dosage, which could have left the refill vial nearly empty. However, the trial court was free to consider that Mr. Green had not taken his previous prescription for Vicodin, a brand of hydrocodone, at the prescribed rate and to reject plaintiff's testimony as to usage of the Ambien refill in a manner that was inconsistent with Mr. Green's usage of the original prescription. Instead, the trial court could rationally rely on plaintiff's repeated statements shortly after Mr. Green's death that pills were missing, which implies that the vials containing the prescription medication were not empty on the morning of his suicide.

Clearly, plaintiff's credibility was relevant to the determination of this issue, given the court's implicit acceptance of her testimony that a number of pills sufficient to cause death was available and taken by Mr. Green and rejection of her testimony indicating that the vials were nearly empty on the date of his death. Indeed, if the plurality's analysis were accepted as logical, the obvious question would be: Why did plaintiff make statements on several occasions shortly after her husband's death that "pills were missing" or that pills were involved in her husband's death?

Another prong of the trial court's decision was its finding that plaintiff's refusal to allow an autopsy or toxicological exam of her husband on religious grounds was "not reasonable or credible," given that she allowed him to be cremated. The court noted that "a simple toxicological examination . . . would have shed a huge amount of light concerning the cause of her husband's death," and that plaintiff was trying to "hav[e] it both ways" by "arguing a lack of evidence to overcome the presumption [against suicide] and at the same time engaging in actions [that prevented her from finding out] how her husband, in fact, died." In the court's opinion, plaintiff "didn't really want to find out [the cause of her husband's death] because she was afraid . . . that [he], in fact, did commit suicide."

The plurality contends that plaintiff's decision to bar the autopsy and toxicology report but to allow cremation can be reconciled because she testified that Mr. Green told her he wanted to be cremated. This again turns on credibility, and the trial court was free to reject that testimony, which it implicitly did when it found that a conflict existed.

The plurality opines that in any event plaintiff's fears that defendant committed suicide do not establish an intentional overdose. This ignores the fact that "[c]ircumstances insignificant in themselves may acquire probative force as links in the chain of circumstantial proof" (*Van Iderstine Co. v Barnet Leather Co.*, 242 NY 425, 435 [1926]). The Court of Appeals expressly included the conflict between plaintiff's position as to an autopsy and toxicology examination and her position on cremation, which undermines plaintiff's credibility as a whole, in summarizing the "[c]onsiderable evidence [that] supported defendant's contention that Mr. Green committed suicide" (12 NY3d at 345).

In an attempt to avoid the consequence of this conflict and limit the finding that plaintiff was not credible to those specific instances where her testimony was directly contradicted by her own prior inconsistent statements or by the testimony of other witnesses, the plurality dons an ethicist's cap to argue that each Jew makes an independent choice as to which of the 613 mitzvot of the Torah he or she will live by and that it is improper to find a Jewish person unworthy of belief based on the reasoning that he or she abides by some aspect of Jewish law but not another. While the plurality states that this is what the trial court did, and that I do it as well, it is in fact the plurality that turns a blind eye to the record and the role of the finder of fact in making credibility determinations and weighing evidence.

"A judicial factfinder should make credibility determinations

on the basis of demeanor, forthrightness in answering, consistency or lack thereof in the account being given, interest in the outcome and other relevant considerations" (*Gass v Gass*, 42 AD3d 393, 401 [2007, Sullivan, J., dissenting]). PJI 1:41, "Weighing Testimony," similarly provides: "In deciding what evidence you will accept you must make your own evaluation of the testimony given by each of the witnesses, and decide how much weight you choose to give to that testimony. The testimony of a witness may not conform to the facts as they occurred because he or she is intentionally lying, because the witness did not accurately see or hear what he or she is testifying about, because the witness' recollection is faulty, or because the witness has not expressed himself or herself clearly in testifying. There is no magical formula by which you evaluate testimony. You bring with you to this courtroom all of the experience and background of your lives. In your everyday affairs you decide for yourselves the reliability or unreliability of things people tell you. The same tests that you use in your everyday dealings are the tests which you apply in your deliberations. The interest or lack of interest of any witness in the outcome of this case, the bias or prejudice of a witness, if there be any, the age, the appearance, the manner in which the witness gives testimony on the stand, the opportunity that the witness had to observe the facts about which he or she testifies, the probability or improbability of the witness' testimony when considered in the light of all of the other evidence in the case, are all items to be considered by you in deciding how much weight, if any, you will give to that witness' testimony."

Applying these standards, the trial court, in weighing the evidence, could consider that there was no proof that Mr. Green himself was observant of Jewish law to any degree whatsoever or that he instructed that, in the event of his death, no autopsy or toxicology examination should be performed because they would violate his adherence to Jewish law.

The plurality contends that in the absence of any direction by Mr. Green on the issue of an autopsy and toxicological exam, his surviving relatives could feel free to make the decision based on their own views and observances. Although one would understand that, on the night of her husband's death, plaintiff was upset and did not want to allow an invasion of Mr. Green's body, the plurality ignores the evidence that plaintiff adhered to her decision not to allow an autopsy or toxicological report after consulting with attorney Wolff and being advised by a deputy medical examiner of the potential insurance consequences of not allowing such examinations. The trial court rightfully found

that these circumstances reflect "a much more studied[,] deliberate decision," based on potential legal ramifications, rather than on Jewish law, and that a negative inference may be drawn therefrom.

Lastly, the trial court's determination was based in part on its acceptance of the unrebutted expert testimony of Dr. Baden. It is well settled that the credibility of experts and the appropriate weight to be accorded to their testimony are matters to be resolved by the trial court, sitting as the finder of fact (see Sagarin v Sagarin, 251 AD2d 396 [1998]).

The foregoing demonstrates that the trial court's findings of fact as to material issues, including motive and opportunity, rest largely upon considerations relating to credibility. Accordingly, contrary to the plurality's position, this matter must be reviewed under the Thoreson "fair interpretation of the evidence" standard (see e.g. Siebert v Dermigny, 60 AD3d 526 [2009]; Matter of Falk, 47 AD3d 21, 28 [2007], lv denied 10 NY3d 702 [2008]; Watts v State of New York, 25 AD3d 324 [2006]; Saperstein v Lewenberg, 11 AD3d 289 [2004]). Further, because the trial court was in the unique position of observing the witnesses's demeanor, its credibility determinations are owed deference (see Sterling Inv. Servs., Inc. v 1155 NOBO Assoc., LLC, 65 AD3d 1128, 1129-1130 [2009], lv denied 13 NY3d 714 [2009]).

Applying the correct standard of review, I find that the trial court's determination that defendant met its burden of overcoming the presumption against suicide is supported by a fair interpretation of the evidence. While there was no evidence that Mr. Green had a plan to commit suicide, there was strong circumstantial evidence indicating that it is "highly probable" that he did so. This evidence includes Mr. Green's statements to Dr. Bos the day before he died that he was depressed, having difficulty sleeping, out of work, and feeling under pressure and that he did not see the point of being alive; Mr. Green's financial and legal problems, including his child support obligations and inability to earn, due to the restrictive covenant he was litigating, which left him unemployed for months; the discovery of Mr. Green lying on his bed with an empty glass on the nightstand beside him and two empty bottles that had contained recently prescribed pain medication in the nightstand drawer; plaintiff's comments to several parties shortly after Mr. Green's death that he was depressed, that pills were missing and that Mr. Green overdosed on medication; Mr. Green's general good health, aside from the hernia operation; and the conflict between plaintiff's refusal to permit an autopsy or a toxicological

examination of Mr. Green's body based on Jewish law while ordering the body cremated in violation thereof. Further, there was the unrebutted expert testimony of Dr. Baden that most suicides are not planned and are committed on the basis of opportunity; that suicide is frequently the result of an "acute reactive depression"; that the ingestion of 10 10-milligram Ambien pills or 20 5-milligram hydrocodone pills would be sufficient to cause death; and that suicide notes are found in only approximately 25% of cases where suicide is later determined to have been the cause of death.

To avoid this result, the plurality and the concurrence contend that the trial court improvidently allowed Dr. Baden to testify despite late disclosure. I disagree.

Before trial, in response to an interrogatory, defendant advised plaintiff that it had not retained an expert. After Dr. Bos testified at trial, defendant sent plaintiff a letter stating that it had retained Dr. Baden as an expert "as the result of the surprising efforts of Dr. Bos to change his deposition testimony concerning the admissions made to him by [plaintiff] on February 20, 2002 and what I am told is his inaccurate testimony concerning the significance of 'suicidal thoughts.' " As to the scope of Dr. Baden's anticipated testimony, the letter stated: "Dr. Baden has reviewed the claim file and is expected to testify that the presence of suicidal thoughts is a significant factor in determining whether the death of an individual was the result of suicide under the circumstances presented. He is also expected to testify that toxicology could have determined whether Alan Green took a quantity of medication sufficient to cause his death and the quantity of hy[d]rocodone and/or Ambien sufficient to cause death. Dr. Baden is also expected to testify that there is no recognized religious objection to performing a toxicological examination of a Jewish decedent."

Plaintiff moved to preclude Dr. Baden's testimony, and defendant opposed the motion. Upon consideration of the parties' written submissions and oral argument, the trial court found that defendant made a "sufficient showing of good cause" for the delay in retaining Dr. Baden because while Dr. Bos's trial testimony was similar to his deposition testimony in many respects, "in its totality, his testimony at trial significantly weakened the position that Mr. Green committed suicide based upon his interview of Mr. Green, as well as upon his conversations with Mrs. Green and the police." Significantly, the trial court found that there would be no prejudice to plaintiff as a result of allowing Dr. Baden to testify, because the late notice did not affect the way that plaintiff had conducted her case

until then, except that if plaintiff had known defendant was going to call an expert, she might have engaged her own expert as well. To remedy any prejudice in that regard, the trial court offered plaintiff the opportunity to retain her own expert and to have the expert testify at trial as to the same issues that Dr. Baden would address, going so far as to state that it would allow plaintiff to expand on those issues upon proper notice. The trial court also offered to direct defendant to specify the exact basis for Dr. Baden's opinion, the facts on which he was relying, and his qualifications. Plaintiff declined both offers.

CPLR 3101 (d) (1) (i) provides that "[u]pon request, each party shall identify each person whom the party expects to call as an expert witness at trial and shall disclose in reasonable detail the subject matter on which each expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify, the qualifications of each expert witness and a summary of the grounds for each expert's opinion."

The statute further provides that where a party "retains an expert an insufficient period of time before the commencement of trial to give appropriate notice thereof," it must show "good cause" for the delay. In that regard, "upon motion of any party, made before or at trial, or on its own initiative, the court may make whatever order may be just" (*id.*).

Whether expert disclosure is so late as to warrant preclusion "is left to the sound discretion of the trial court" (*McGlauflin v Wadhwa*, 265 AD2d 534 [1999]; *Tamborino v Burakoff*, 224 AD2d 609 [1996]; *Lesser v Lacher*, 203 AD2d 181 [1994]). A party should not be precluded from proffering expert testimony "merely because of noncompliance with the statute, unless there is evidence of intentional or willful failure to disclose and a showing of prejudice by the opposing party" (*Hernandez-Vega v Zwanger-Pesiri Radiology Group*, 39 AD3d 710, 710-711 [2007] [internal quotation marks and citations omitted]; *St. Hilaire v White*, 305 AD2d 209, 210 [2003]; *Lanoce v Kempton*, 8 AD3d 449, 451 [2004]; *Karoon v New York City Tr. Auth.*, 286 AD2d 648 [2001]). Further, good cause has been found to exist to permit an expert to respond to evidence at trial where the need for the testimony came as a surprise during the trial (*see e.g. Benedict v Seasille Equities Corp.*, 190 AD2d 649, 649-650 [1993]; *Simpson v Bellew*, 161 AD2d 693, 698 [1990], *lv denied* 77 NY2d 808 [1991]).

Here, there is no indication either that defendant's failure to disclose Dr. Baden until the middle of trial was intentional or that plaintiff was prejudiced by the late disclosure. Rather, de-

fendant was surprised when Dr. Bos tried to distance himself at trial from the testimony that he gave at his deposition that *plaintiff* believed that defendant had committed suicide. While Dr. Bos testified at his deposition that when plaintiff called him after Mr. Green's death she mentioned suicide and missing pills and that he did not remember plaintiff telling him that the police or an emergency medical technician told her it was suicide, at trial he initially testified that he did not think that plaintiff had mentioned the word suicide, that he did not remember whether plaintiff had said that Mr. Green had taken pills, and that he could not recall whether plaintiff or the police inspector told him that there was an empty pill vial. Dr. Bos also sought to weaken the implication that Mr. Green had committed suicide by testifying that it was not uncommon for people who feel depressed not to see the purpose of life, but that "besides the behavior patterns and the general impression at the time of the consultation," it was "a concrete plan of really ending it all" that would establish that someone was suicidal.

Accordingly, the trial court providently exercised its discretion when it permitted defendant to call Dr. Baden as a witness to respond to Dr. Bos's statements, limited the scope of that testimony, and offered plaintiff the opportunity to call her own expert witness in rebuttal, thereby eliminating any prejudice (*see Putchlawski v Diaz*, 192 AD2d 444 [1993], *lv denied* 82 NY2d 654 [1993]). In *Putchlawski*, under similar circumstances, we stated: "CPLR 3101 (d) (1) (i), which, in medical malpractice actions, requires disclosure of the subject matter on which an expert is expected to testify, but not his or her identity, also gives the court discretion 'for good cause shown' to 'make whatever order may be just' in the event of noncompliance. Such discretion was properly exercised here under circumstances showing that the noncompliance was not calculated to put plaintiff at an unfair disadvantage. The court gave plaintiff an opportunity to call a pathologist expert of his own, and placed appropriate restrictions on the testimony of the challenged expert witness" (192 AD2d at 445 [citation omitted]).

The plurality finds that the differences between Dr. Bos's deposition and his trial testimony do not rise to the level of good cause. However, given that there is no showing that defendant's conduct was intentional or that plaintiff was prejudiced, it cannot be said that the trial court improvidently exercised its discretion, and there is no basis for this Court to substitute its discretion for that of the trial court, even if the decision to preclude would equally have been a provident exercise of discretion (*see Tamborino*, 224 AD2d at 610). As the trial court

explained, "[E]ven though, individually, one can argue about the interpretation of his testimony with respect to Mrs. Green and the pills or Mr. Green and whether he said life wasn't worth living or used different words, in it's totality [*sic*] Dr. . . . Bos's testimony weakened the case which the defendant has to show in this case to prove its affirmative defense." This view of the testimony should not be disturbed because there is a material difference between Dr. Bos's deposition testimony that plaintiff, not the police, told him that Mr. Green took pills and committed suicide and his trial testimony that he merely drew the impression from his conversation with plaintiff that Mr. Green may have committed suicide. It was also appropriate to retain Dr. Baden to respond to Dr. Bos's trial testimony that a person who expresses suicidal thoughts does not present the same risk as one who expresses a suicidal plan, and that, while, forensically speaking, a lethal dose of Ambien exists, he had never read about patients overdosing on the drug.

The plurality believes that plaintiff was prejudiced because defense counsel sought to call Dr. Baden to remedy a problem caused by the testimony of Dr. Bos, a witness called by the defense, not by plaintiff, who did nothing to create the predicament in which the defense found itself. However, this is the very situation that occurred in *Simpson v Bellew* (161 AD2d 693 [1990], *supra*), which the plurality cites. In *Simpson*, the appellate court found that the trial court properly exercised its discretion when it allowed defendant to call an expert to rebut the surprise testimony of a police officer, notwithstanding that the police officer was a defense witness.

The plurality also finds that plaintiff was prejudiced because "as a practical matter, plaintiff's counsel could not undertake the task of locating a new expert to challenge Dr. Baden's opinions and assertions as part of a rebuttal case." This speculative contention is belied by the record, which establishes that the trial court's offer, in this *nonjury* trial, was not illusory and that, in rejecting it, plaintiff made a strategic choice:

"THE COURT: You [plaintiff] rest. It is a non jury case. That's one of the reasons the type of flexibility that was permitted in this case was taken into account. And if you want to call an expert *we'll wait for you to do that*.

"PLAINTIFF COUNSEL: Thank you for the opportunity, Judge, but it doesn't, *its not in my plans*—

"THE COURT: All right.

"PLAINTIFF COUNSEL: —*or the plaintiff's plans to call an expert*" (emphasis added).

Nor is there merit to the plurality's objection to Dr. Baden's

testimony on the ground that no explanation was given as to why a forensic pathologist should be permitted to testify on the psychology or state of mind of an individual who commits suicide. Under New York law, "expert opinions are admissible on subjects involving professional or scientific knowledge or skill not within the range of ordinary training or intelligence" (*Matter of Nicole V.*, 71 NY2d 112, 120 [1987]). Courts of this state have admitted expert testimony regarding physical and behavioral responses and reactions that are not generally understood (*see People v Henson*, 33 NY2d 63 [1973] [battered child syndrome]). In *Broun v Equitable Life Assur. Socy. of U. S.* (69 NY2d 675, 676 [1986]), the Court of Appeals held: "There must, nevertheless, be a reversal, for the exclusion of Dr. Baden's opinion that decedent's death was a suicide was an abuse of discretion as a matter of law. Although the jury may have been able to evaluate some of the evidence presented, *whether the number of pills required to reach the level of toxicity found in decedent's body could have been taken inadvertently or whether the circumstances surrounding the body were consistent with general patterns of behavior exhibited by other suicide victims were not matters within their ken*" (emphasis added).

Here too, Dr. Baden testified about general patterns of behavior exhibited by suicide victims. Moreover, the record reflects that Dr. Baden's direct testimony was limited and that plaintiff elicited testimony from him on cross-examination that exceeded the scope of his direct examination, such as the statement that suicide is frequently the result of "acute reactive depression" and that suicide notes are only found in 25% of cases. Further, by rejecting the trial court's offer to demand that defendant amplify its response to her interrogatory, plaintiff waived her argument that defendant's expert notice failed to comply with CPLR 3101 (d) (1) (i).

The plurality also contends that Dr. Baden's testimony was given an undue weight. This conclusion does not withstand scrutiny.

It is well settled that the weight to be accorded an expert's testimony, based upon his qualifications, is for the trier of fact to decide (*see Borawski v Huang*, 34 AD3d 409, 410-411 [2006]; *Beizer v Schwartz*, 15 AD3d 433, 434 [2005]; *Rushford v Facteau*, 280 AD2d 787, 789 [2001]). "Moreover, the trial court's assessment of the credibility and weight to be accorded an expert's testimony in a nonjury trial is entitled to deference by a reviewing court" (*Levy v Braley*, 176 AD2d 1030, 1033 [1991]). Although an expert's testimony may be rejected by the trial court if it is improbable, in conflict with other evidence or otherwise

legally unsound, Dr. Baden's testimony was not rebutted and no such challenge is raised on appeal. While the plurality states that, contrary to Dr. Baden's assertion that most suicides are not planned and are committed on the basis of opportunity, recent studies establish that most suicides are not attempted impulsively and do involve a plan, this retrospective critique of Dr. Baden carries no weight. The trial was held in 2005 and the fact that a single 2008 study, which was not in the trial record, disagrees with Dr. Baden's opinion does not establish either that he did not present the trial court with the prevailing scientific view at the time of trial or that his opinion has in fact been discredited by the scientific community.

The plurality also argues that the presumption against suicide was not overcome because suicide was "far from the only reasonable conclusion to reach" since there were a variety of other possible explanations for Mr. Green's death, such as natural causes, an adverse reaction to medication or an accidental overdose. However, the Court of Appeals has explained that the instruction that a finding of suicide is permissible only when "no conclusion other than suicide may reasonably be drawn" is a way of telling jurors that "they should not find suicide unless the evidence shows suicide to be highly probable" (*Green*, 12 NY3d at 347), a conclusion that, for the reasons set forth above, is supported in this case by a fair interpretation of the evidence.

Further, as the trial court found, "it is pure speculation that [Mr. Green's] death was . . . a result of natural causes," particularly given "the availability of pills in the apartment which were sufficient to cause his death." Plaintiff was not aware that Mr. Green had ever experienced an adverse reaction to either hydrocodone or Ambien, and, aside from a recent non-life-threatening hernia operation, Mr. Green was in very good health at the time of his death.

The plurality's hypothesis of an accidental overdose might be plausible if there were some pills left in the prescription vials after Mr. Green's death. Thus, if 1, 2, 3, 4, 5, or even 10 pills had been left in either vial, a plausible argument could be made that Mr. Green may have accidentally or mistakenly taken too much of either Ambien or hydrocodone or a combination of both. However, there were no pills left in either vial, and it was up to the trial court, as the trier of fact, to draw the appropriate inferences. While there was no direct evidence that Mr. Green committed suicide, as noted above, there was extremely strong circumstantial evidence supporting the court's conclusion that he committed suicide by overdosing on prescription pills.

Finally, as noted by the trial court, while it is true that, in

many of the cases, including *Schelberger* and *Wellisch*, cited by plaintiff, the jury found that the defendant insurer had not overcome the presumption against suicide, the issue before all the appellate courts, with few exceptions, was whether or not there should have been a directed verdict for the defendant or a determination that the finding of the jury that there was no suicide was against the weight of the evidence. Here, however, we are reviewing a finding by the trier of fact that defendant overcame the presumption against suicide.

Accordingly, the judgment dismissing the complaint should be affirmed.