[845 NYS2d 287]

In the Matter of the Estate of VICTORIA FALK, Deceased. JOSEPH FASHING et al., Appellants; PAVEL HILLEL et al., Respondents.

First Department, November 13, 2007

### APPEARANCES OF COUNSEL

*Bashian & Farber, LLP,* White Plains (*Annette G. Hasapidis* of counsel), for appellants.

*Seth Rubenstein, P.C.,* Brooklyn (*Nora S. Anderson* and *Seth Rubenstein* of counsel), for respondents.

### OPINION OF THE COURT

NARDELLI, J.

In this appeal, we are asked to determine whether Surrogate's Court properly denied, for lack of due execution, admission of the document, dated September 4, 2000, to probate as the last will and testament of Victoria Falk.

Victoria Falk (decedent) was an unmarried, 91-year-old woman, with no offspring, at the time of her death on September 13, 2002. Decedent left an estate valued between $425,000 and $500,000. Petitioner Ruxandra Ghenovici was decedent's caretaker and resided with her for the last 9½ years of her life. Petitioner Joseph Fashing was decedent's attorney at all relevant times and drafted the purported will in question (the will). The objectants, Pavel Hillel and Victoria Hillel Jacobs, are decedent's nephew and niece, respectively. The will was witnessed, following an attestation clause, by Fabian Rodriguez, Jose Mora and Linda A. Bahoritsch.

The will made a number of minor bequests to friends, non-profit organizations and various relatives, including the objectants. The genesis of this proceeding, however, is the bequest to Ghenovici, the language of which, according to Fashing's testimony, was personally drafted by decedent:

> "To my dear friend Ruxandra Ghenovici, residing with me since May 1993. In appreciation of her daughterly devotion and because I consider her as a daughter I never had, it is my ardent desire to know that she shall be settled comfortably. Taking this into consideration and knowing that all of the other young members of my family are already comfortably settled in their own apartments or houses, far from being in need of basic furniture and household items, I decided to do for Ruxandra what I did for the others when they were on the threshold of a

new life in America. Consequently, I am giving her the following items [of personal property] . . .

"TENTH: It is my desire that, upon my death, the home which I own on lot number 3 on Main Street, in Margareten Park, Route 23A, in the Village of Hunter, New York and its entire contents, go to my dear friend and companion, Ruxandra Ghenovici, who loves the place, and I am convinced will appreciate and take care of it in the same manner in which I did."

Ghenovici, it should be noted, was also the beneficiary of the testatrix's residuary estate.

The will was offered for probate by Fashing and Ghenovici by petition dated November 25, 2002 and, on March 13, 2003, objectants examined Rodriguez and Bahoritsch, two of the three subscribing witnesses to the will, pursuant to SCPA 1404. The third witness, Mora, was not examined as he had relocated to Puerto Rico. Objectants thereafter filed objections on several grounds and, after discovery, "concluded that due execution was the only real bone of contention," resulting in the withdrawal of their undue influence[1] and fraud objections in February 2005. Objectants also withdrew their jury demand and proceeded to a hearing on due execution, which was scheduled for November 18, 2005.

Fashing testified, inter alia, that: he drafted the will, was present when decedent signed it, and offered to "round-up . . . witnesses on the spot" to complete its execution, but that decedent stated she preferred to procure witnesses herself; he gave decedent oral and written instructions about how a will should be witnessed, but failed to produce a writing to verify such; was sure he received the will, witnessed, within 30 days of its execution, but failed to produce a log entry or other writing

---

1. Objectants, on the eve of trial, sought a brief continuance to conduct discovery with a view toward possibly reinstating the objection of undue influence, having learned that a resident of New Mexico had committed suicide and left his entire estate to Ghenovici, to the exclusion of his blood relatives, pursuant to a will drafted by Fashing. In addition, Fashing and his daughters were the witnesses to that will and, as in this matter, Fashing was the nominated executor. Surrogate's Court characterized the foregoing situation as "at least an astounding coincidence . . . of parties and beneficiary and draftspersons and exclusion of natural objects of bounty, et cetera . . . warrant[ing] inquiry by the court," but held objectants' request in abeyance and proceeded with proof of due execution of the instrument. The issue of undue influence was never revisited.

to substantiate the claim; after Falk's death, he prepared an affidavit of attesting witness for Bahoritsch and accompanied Ghenovici and Bahoritsch to a notary to execute the affidavit; the affidavit falsely stated that Bahoritsch had witnessed decedent subscribe the will, which he asserted was an oversight; and he did not obtain affidavits from the other witnesses.

Mora, having traveled from Puerto Rico, testified, among other things, that: he was the superintendent of the building in which decedent resided; he received a message from the doorman, in September 2000, to come to decedent's apartment and bring someone with him; he thereafter proceeded to the apartment with Fabian Rodriguez, a porter in the building; and once in the apartment, decedent spoke to him in a soft voice, which he could not understand, and pointed to Ghenovici, who identified the will and requested his signature. Mora further testified that: he believed the document he signed was a will; he recognized decedent's signature on the document from other notes she had sent to him in the past regarding work to be done around the building; and he saw Rodriguez sign the document.

Mora's testimony, unfortunately, is contradicted, in varying degrees, by writings he himself signed. In an affidavit obtained by petitioners' counsel, which Mora admits signing, although he claims not to have been sworn before executing, he averred that decedent, rather than speaking inaudibly, had stated she had just signed her will and asked him to sign, which he did on the first line. In a signed statement obtained by objectants' counsel, however, Mora contended that: Ghenovici called him to Falk's apartment; Falk was present, but took no part in what transpired; Ghenovici asked him to sign the paper, and he did not see Falk sign her name and Falk did not say she signed the paper; no one told him what he was signing; and Falk said absolutely nothing, and never left her chair the entire time he was in the apartment.

Bahoritsch testified that: she was in her apartment when decedent and Ghenovici stopped by; decedent then asked her to witness her last will and testament, to which she agreed; she had no recollection of decedent signing the will in her presence, but Falk's signature was on the document when she signed it; and she could not recall any other names on the document.

Bahoritsch was thereafter presented with the affidavit of attestation prepared by Fashing. She initially testified that she did not recall reading it, but maintained that it was her practice to read things before affixing her signature, and she later testi-

fied that she read it in front of the notary before signing it. Moreover, although the document set forth that decedent could read, write and converse in English, Bahoritsch did not know if she could read or write English. Bahoritsch also testified that she could not recall whether the signature of decedent was already present or decedent signed the will in front of her. Although she attested, at her deposition, that she recalled decedent signing the will in front of her, her previous deposition testimony did not refresh her recollection as to whether she witnessed such an act.

Rodriguez, the third witness, could not be located at the time of the hearing, so his deposition testimony was admitted as testimony by Surrogate's Court. Rodriguez identified his signature on the will, and attested that Ghenovici, alone, approached him in the lobby of the building with a paper and told him that decedent wanted him to sign it so that she could put him in her will. Ghenovici is alleged to have given Rodriguez $5 after he signed the document in the lobby. Rodriguez further testified that decedent did not tell him she signed the will and, in fact, she could not communicate with him at all, except through gestures, because she spoke no English. Rodriguez also noted that the other witnesses' names were not on the document when he affixed his signature.

Surrogate's Court, by decision and order dated December 30, 2005, denied the petition for probate on the grounds that the record, taken as a whole, is insufficient to demonstrate that the elements of due execution were met. We agree and affirm.

The formal requirements[2] for the execution and attestation of wills are set forth in EPTL 3-2.1 (a), which provides, in pertinent part, that: the will must be in writing; it shall be signed at the end thereof by the testator; the signature must be affixed in the presence of each of the attesting witnesses, or acknowledged by the testator to each of them to have been af-

---

**2.** The formalities which must be observed for the valid execution of a will have their origins in the law of the early Roman Republic, at the time of the Twelve Tables (circa 450 b.c.). The early Roman will required a declaration of the testator's intent in formulaic language and writing, before several witnesses, the witnesses' application of their seals to insure that the writing was not altered, and the performance of certain ceremonial procedures (*see* Nicholas, An Introduction to Roman Law, at 256-257 [1962 ed]). Indeed, it has been noted that the entire concept of the will, as it currently exists in English law, was derived from Roman law (*see Matter of Van Ness*, 78 Misc 592, 600-601 [1912]; *see also Matter of Roe*, 82 Misc 565, 570 [1913]; Helmholz, *The Transmission of Legal Institutions: English Law, Roman Law, and Handwritten Wills*, 20 Syracuse J Int'l L & Com 147 [1994]).

fixed by him/her; the testator must declare to each attesting witness that the instrument is his/her will; there shall be two witnesses whose attestations shall be within a 30-day period; and the witnesses must sign at the testator's request.

Surrogate's Court, before admitting a will to probate, must be satisfied that the execution of the will was valid, even if no interested party files an objection to its validity (*see* SCPA 1408; *Matter of Pirozzi*, 238 AD2d 833, 834 [1997]), and the burden of demonstrating that the purported will was duly executed lies squarely with the proponent, who must prove such by a preponderance of the evidence (*Matter of Rosen*, 291 AD2d 562 [2002]; *Matter of Tully*, 227 AD2d 288 [1996]). While it is well settled that in those situations where the attorney-draftsperson supervises the execution of a will, a presumption of regularity arises that the will was properly executed in all respects (*Matter of Moskoff*, 41 AD3d 481 [2007]; *Matter of James*, 17 AD3d 366, 367 [2005]), no such presumption comes into play herein as the testimony of the parties makes clear.

The attestation clause also raises a presumption of validity, although it is incumbent upon Surrogate's Court to examine all of the circumstances attendant to the execution of the document in order to ascertain its validity (*see Matter of Collins*, 60 NY2d 466, 471 [1983]; *Matter of Yenei*, 132 AD2d 870 [1987]). In so doing, the testimony of the attesting witnesses is entitled to great weight (*Matter of Collins*, 60 NY2d at 473, citing *Orser v Orser*, 24 NY 51, 52 [1861]).

The attestation clause herein states, in relevant part, that: "We, the undersigned, do hereby attest that VICTORIA H. FALK, the above named testatrix, declared to each of us that the foregoing instrument is her last will, and that she acknowledged to each of us that her signature was affixed thereto by her . . . ."

The publication requirement mandates that decedent make her intention known that the document is to serve as her will, and absent such declaration, the instrument should not be admitted to probate (EPTL 3-2.1 [a] [3]; *Matter of Pirozzi*, 238 AD2d at 834; *Matter of Griffin*, 81 AD2d 735 [1981], *lv denied* 54 NY2d 602 [1981]). " '[S]ubstantial compliance will be sufficient and no particular form of words is required, or is necessary, to effect publication' " (*Matter of Pilon*, 9 AD3d 771, 772 [2004], quoting *Matter of Turell*, 166 NY 330, 337 [1901]; *see also Matter of Pirozzi*, 238 AD2d at 834, quoting *Matter of Roberts*, 215 AD2d 666 [1995] ["(p)ublication can be through

words or actions, but something must occur to show that there had been 'a meeting of the minds between the testator and the attesting witnesses that the instrument they were being asked to sign as witnesses was testamentary in character' ''']).

In the matter at bar, despite the existence of the attestation clause and the concomitant presumption, the circumstances surrounding the execution of the will, garnered from the evidence proffered at trial, clearly do not preponderate in favor of petitioners. Indeed, the trial testimony, deposition testimony and various signed and/or sworn statements present such varying accounts of what allegedly transpired that it is unclear what occurred. These inconsistences, notably, are readily obvious not only when comparing the accounts given by the opposing witnesses, but are also pervasive in the various accounts given by the same witness.

Bahoritsch testified that decedent declared the document to be her will, and requested that she witness it, but there was no testimony that decedent declared her signature to be on the document. In addition, Bahoritsch's testimony is obfuscated by previous attestations (in an affidavit and at her deposition) that she saw decedent execute the will, while decedent's attorney claims that he witnessed the execution outside the witness's presence.

Rodriguez, on the other hand, does not state there was any publication or acknowledgment on the part of decedent, despite his signature on the attestation clause. Further, Rodriguez claims to have been approached by Ghenovici while in the lobby of the building where he was employed, which was where he signed the document and received $5 for his efforts. His testimony is wholly at odds with that of Mora, who claims, in at least in two of his narratives, that Rodriguez signed the will in front of him at decedent's residence.

Mora testified at trial that the will was published by Ghenovici, arguably in decedent's presence, and it was also Ghenovici who requested his signature on the document. Mora, however, does not assert that decedent acknowledged her signature as appearing on the document, and his previous SCPA 1406 affidavit and statement to objectants' counsel are at odds with each other, as well as with the trial testimony. In the statement, Mora alleged that he was not told what the document was, and that Ghenovici asked for his signature, with decedent not participating at all. In the affidavit, Mora attests that decedent told him she had just signed her will, that it was her

signature that appeared on the will, and asked him to sign the will which was on the counter top in the kitchen. At trial, Mora claimed that decedent said something to him, but he could not hear what she said, and it was Ghenovici who published the will and asked him to sign it.

In view of the foregoing, we agree with Surrogate's Court that petitioners failed to shoulder their burden of demonstrating that the execution of the will was valid. Accordingly, Surrogate's Court properly concluded that there was no meeting of the minds between decedent and the witnesses and denied admission of the will to probate. To the extent that petitioners find fault with the Surrogate's Court's credibility determinations, it is well settled that a decision rendered by a trial court after a nonjury trial should not be disturbed on appeal "unless it is clear that the court's conclusions could not have been reached upon a fair interpretation of the evidence, especially where the findings of fact rest in large measure on considerations relating to the credibility of witnesses" (*Bercow v Damus*, 5 AD3d 711, 712 [2004]; *see also Matter of Piterniak*, 16 AD3d 513, 513-514 [2005]). While this Court's power to review the record is as broad as that of the trial court, "due regard must be given to the decision of the Trial Judge who was in a position to assess the evidence and the credibility of the witnesses" (*Universal Leasing Servs. v Flushing Hae Kwan Rest.*, 169 AD2d 829, 830 [1991]; *see also 300 E. 34th St. Co. v Habeeb*, 248 AD2d 50, 54-55 [1997]).

Here, the Surrogate's Court, which had the opportunity to see the witnesses and hear their testimony, found them to be incredible, and we are presented with absolutely no reason to disturb that determination on appeal.

In view of the above, we find it quite clear, and it should likewise be so to the bar, that the best practice is to discourage clients from executing a will outside the attorney's office or, at the least, without the supervision of an attorney. However, if the client insists and/or the circumstances demand, the attorney should deliver a written memorandum to the client explaining the fairly straightforward formalities, in clear and simple terms, which must be observed. The client should be requested to sign and return the memorandum after the execution ceremony, acknowledging with some detail that the instructions were followed. This simple procedure will, to a large extent, negate the need for a proceeding such as this and abrogate the possibility that a decedent's testamentary intent will be frustrated.

Accordingly, the decree of the Surrogate's Court, New York County (Kristin Booth Glen, J.), entered February 2, 2006, which, after a nonjury trial, denied the petition seeking admission of the document dated September 4, 2000, to probate as the last will and testament of Victoria Falk, should be affirmed, without costs.

SAXE, J.P., BUCKLEY, GONZALEZ and SWEENY, JJ., concur.

Decree, Surrogate's Court, New York County, entered February 2, 2006, affirmed, without costs.