McGuire, J.,
dissents in a memorandum as follows: The majority holds that the deposition testimony of Barbara Sammons does not raise a material issue of fact on the question of whether the will was duly executed. The majority so holds because it concludes that the deposition testimony given by Ms. Sammons that I quote below, “read in context, can also be interpreted as stating that she could not confirm the statements made in the attestation clause because she didn’t remember an event almost 50 years earlier.” Ms. Sammons, however, certainly did not testify merely that she could not remember those circumstances and her testimony certainly cannot as a matter of law only be so interpreted. Rather, viewing her testimony as a whole, the trier of fact reasonably could conclude that an execution ceremony in accordance with the law had never taken place. For that reason, I respectfully dissent.
Ms. Sammons was 69 years old at the time of her deposition, almost 49 years after the date the will allegedly was executed and attested to in accordance with the then-applicable law, Decedent Estate Law § 21. She testified that she began working for the decedent, Dr. Seymour Halpern, in 1956, when she was 19 years old, and worked for him as a “medical assistant” until she was 21. A woman named Mary Ann also worked for the decedent. The decedent’s practice was in internal medicine and Ms. Sammons’s duties included secretarial work, such as answering phones, sending out bills, handling correspondence with other doctors, and assisting with examinations.
*435 When questioned by counsel for the proponents of the will, two of the decedent’s three children, Ms. Sammons testified that she recognized what appeared to be her signature on the will. Apart from noting the passage of nearly 50 years, Ms. Sammons had no reason to believe that the signature was not hers. With respect to the address next to her signature, Ms. Sammons testified that she did live at that address between 1956 and 1958 and recalled living there in September of 1958 when the will was allegedly signed. Shown the names of the other two subscribing witnesses, Ms. Sammons testified that one of them, Mary Ann Schuder, was the Mary Ann who was her coworker; she did not know anyone named Harry Grayer. Asked if she ever had occasion to sign any documents on behalf of the decedent or in his presence, Ms. Sammons answered, “Not that I remember.” Asked if it was possible she had, she answered, “I don’t know.” Ms. Sammons did not recall signing the will or anything about signing the document; nor did she recall ever signing a document in the presence of the decedent, Ms. Schuder and an attorney. Asked if it was possible she had done so in 1958, she answered, “I don’t remember signing one.” When she was immediately asked the same question, she responded, “Anything is possible 50 years ago.” Asked yet again whether it was possible that she had signed the will in the presence of the two people whose signatures appeared below hers, Ms. Sammons answered, “I guess it could be possible.”
Ms. Sammons was then examined by counsel for the object-ant, the decedent’s second wife. She testified that correspondence coming out of the decedent’s office did not require her signature, and that she did not sign any documents while in the office. Asked if “it would be unique and very much out of the ordinary if [she] did sign any document while in the office,” Ms. Sammons answered, “That’s true.” Ms. Sammons also testified that she did not remember the decedent ever mentioning to her that he had a will, and that she would no longer recognize his signature. At that point, testimony that is critical to the proper resolution of this appeal was elicited:
“Q: At any time, did Dr. Halpern announce or declare to you that he had signed his last will and testament and then asked you to sign as a witness?
“[proponents’ counsel]: Objection.
“A: No.
“Q: If Dr. Halpern had done that, meaning said I am declaring this document to be my last will and testament and, *436 Barbara, I would like you to sign it for me, do you feel that is something you would remember?
“A: Yes, I probably would.
“Q: Why do you think you would remember that?
“A: It’s very specific. I can’t imagine him doing that. As I said, he was very controlling and very private and very . . . .”
This unequivocal “No,” in response to a question that was more specific than those previously asked by counsel for the proponents, was not negated by Ms. Sammons’s later testimony. Nor did her later testimony undermine her explanation for why she “probably” would remember such a declaration and request from the decedent. To the contrary, Ms. Sammons’s testimony that the decedent never stated to her that he had signed his will before asking her to sign it as a witness was reinforced by the testimony she went on to give in response to additional, similarly specific questions posed by counsel for the objectant:
“Q: Now, that paragraph right above your signature says that you, Mary Ann Schuder, the attorney Harry Grayer and Dr. Halpern all executed this Will in each other’s presence. In other words, you’re in the same room at the same time. Did that ever happen?
“A: I don’t remember it happening. Is that the correct answer?
“Q: The correct answer is what you remember.
“A: I don’t remember it happening.
“Q: Was there ever any occasion where you signed any document with a lawyer and Dr. Halpern in the same room at the same time?
“A: Not that I remember.
“Q: Can you say definitively that it did or didn’t happen?
“A: It didn’t happen.
“Q: Can you feel confident when you say that?
“A: I don’t remember it happening. So yes, I do feel confident when I say that.
“Q: You feel confident when you say that it did not occur; is that right?
“A: Right.
“Q: Now, we’re presuming under the—strike that.
“A: How do you expect people to remember what happened 50 years ago? This is what. . .
*437 “Q: I understand, I understand.
“[proponents’ counsel]: Let her finish.
“A: I can’t remember what happened ten years ago. Sorry.
“Q: Well, you do. You remember plenty about your college. So your signature appears on [the will], correct?
“A: It is.
“Q: Did anyone, not just Dr. Halpern, but did anyone tell you that the document you were signing was anybody’s will?
“[proponent’s counsel]: Objection.
“A: No.”
Ms. Sammons also testified that if the decedent had put a document in front of her and told her to sign it, she “probably” would have signed it because he “was controlling, manipulative.” As a 19 or 20 year old, she would not have felt comfortable asking the decedent what he was asking her to sign. She “didn’t think that way back then.”
Ms. Sammons was questioned anew by the proponents’ counsel. Asked if it was possible that there were other people in the room when she signed the will, she answered “I don’t remember,” but acknowledged it was possible. Similarly, she did not recall anyone saying anything to her when she signed the will, but acknowledged it was possible someone had. However, when she was asked more specifically if it was possible that someone told her the document was a will, she first answered “No” before stating, “Anything is possible 50 years ago.”
In pertinent part, the formal requirements for the execution and attestation of a will, as set forth in EPTL 3-2.1 (a), are that: “[t]he signature of the testator shall be affixed to the will in the presence of each of the attesting witnesses, or shall be acknowledged by the testator to each of them to have been affixed by him or by his direction”; “[t]he testator may either sign in the presence of, or acknowledge his signature to each attesting witness separately”; and “[t]he testator shall, at some time during the ceremony or ceremonies of execution and attestation, declare to each of the attesting witnesses that the instrument to which his signature has been affixed is his will.” These formalities have been required to prove due execution of a will for more than 150 years (see Lewis v Lewis, 11 NY 220, 223 [1854]).
*438 “Surrogate’s Court, before admitting a will to probate, must be satisfied that the execution of the will was valid, even if no interested party files an objection to its validity, and the burden of demonstrating that the purported will was duly executed lies squarely with the proponent, who must prove such by a preponderance of the evidence” (Matter of Falk, 47 AD3d 21, 26 [2007] [citations omitted], lv denied 10 NY3d 702 [2008]). Although the attestation clause “raises a presumption of validity ... it is incumbent upon Surrogate’s Court to examine all of the circumstances attendant to the execution of the document in order to ascertain its validity” (id.).
“The publication requirement mandates that decedent make [his] intention known that the document is to serve as [his] will, and absent such declaration, the instrument should not be admitted to probate” (id.; see Lewis, supra). Although due execution may be shown by evidence other than the testimony of the attesting witnesses, “[i]t cannot however be presumed in opposition to positive testimony, merely upon the ground that the attestation clause is in due form and states that all things were done which are required to be done to make the instrument valid as a will” (Lewis, 11 NY at 224; see also Matter of Pirozzi, 238 AD2d 833, 834 [1997], quoting Matter of Roberts, 215 AD2d 666 [1995] [“Publication can be through words or actions, but something must occur to show that there had been ‘a meeting of the minds between the testator and the attesting witnesses that the instrument they were being asked to sign as witnesses was testamentary in character’ ”]).
Although it is true that “a presumption of regularity is raised that the will was properly executed” when an attorney drafts it and supervises its execution (Matter of Leach, 3 AD3d 763, 764 [2004]), and that “this presumption cannot be overcome merely because the attesting witnesses are not able to specifically recall the will execution” (id. at 765), “[n]ot being able to remember the details of the execution ceremony is not the same as testifying that the formalities described in the attestation clause did not occur” (id. [internal quotation marks omitted]). Indeed, where there is no evidence that an attorney supervised the will’s execution and an attesting witness specifically testifies that the statutory formalities did not occur, courts have repeatedly held that the will is not valid (see e.g. Lewis, supra; Matter of Mackay, 110 NY 611 [1888]; Matter of Pulvermacher, 305 NY 378 [1953]; Matter of Falk, 47 AD3d 21 [2007], supra). That is precisely what occurred in Lewis v Lewis (11 NY 220 [1854]), where, according to the factual summary preceding the Court’s *439 opinion, one of the attesting witnesses testified that he and the other attesting witness worked in the deceased’s store at the time the will was signed, he signed his name at the end of the attestation clause at the request of the deceased but the deceased had the paper “so folded or placed upon the desk that he saw no part of the contents, and that neither the same or any part of it was read to him; that he did not see the [deceased] sign it, nor did he see [the deceased’s] signature to it when he signed as a witness” (id. at 222).
The attesting witness further testified that after requesting that he and his coworker sign the document and add their addresses, the deceased stated, “ T declare the within to be my free will and deed’ ” (id. at 225). He and his coworker then signed the document. He did not know with certainty that the document was a will although he believed that it may have been one because “the deceased had that morning sent out and procured a blank will” (id. at 222). The other attesting witness testified that: “he signed his name to the alleged will in the office of the deceased; that he was unable to say what occurred on that occasion, but that according to his recollection he signed it at the request of the deceased; that he had no recollection that the deceased said any thing else to him at the time he requested him to sign it, unless it was ‘to see him sign the document;’ that he did not recollect that the deceased signed the instrument in his presence; that he had no recollection that . . . the other witness[ ] was present when he signed .... On his cross-examination he further testified that according to his recollection he did not read, nor was any part of the instrument read to him when he signed it, and that he had no recollection that he then knew what the paper was” (id.).
The Court of Appeals relied on this testimony from the attesting witnesses in finding that the evidence warranted “the conclusion that the instrument was not subscribed by the decedent in the presence of the witnesses; that the paper was so folded that the witnesses did not see the subscription, and that the only declaration or acknowledgment of the party was in substance, T declare the within to be my free will and deed,’ ” which the Court found insufficient to comply with the statutory requirements (id. at 225). Specifically, the Court stated: “[I]t might probably be inferred that the deceased at the time of requesting the witnesses to subscribe as such, had himself signed the instrument and intended to comply with the statute and make a valid will. But that is not sufficient. The formalities *440 prescribed by statute must be observed, and the attesting witnesses must be informed at the time and by the testator, or in his presence and with his assent, and have a knowledge of all the facts necessary to a due execution and publication of the will, and to which they are called to attest. If the party does not subscribe in their presence, then the signature must be shown to them and identified and recognized by the party, and in some apt and proper manner acknowledged by him as his signature. The statute is explicit, and will not be satisfied with any thing short of a substantial compliance with its terms” (id.).
Almost a century later, the Court of Appeals reiterated this requirement that the “definite formalities” of the statute, one of them being publication of the document as a will, be complied with in order for a will to be admitted to probate (Matter of Pulvermacher, 305 NY 378, 383 [1953], supra). In Pulvermacher, the court stated that “[publication . . . demands, not only that the testator have knowledge of the character of the instrument, but, equally important, that he share that knowledge with his witnesses” (id.). The court explained that “[w]hile no particular form of words is necessary, the courts have held the minimum statutory prescription to be some kind of communication that the instrument, which they are being asked to sign, is testamentary in character” (id. [internal quotation marks omitted]). It further explained: “The reason for requiring publication is twofold: first, to furnish proof that the testator is under no misapprehension, whether by malicious contrivance or otherwise, as to the nature or identity of the instrument, and second, to impress upon the witnesses the fact that, since the document is a will, they are expected to remember what occurred at its execution and be ready to vouch for its validity in court” (id. [internal quotation marks omitted]).
The majority attempts to distinguish Lewis and Pulvermacher from this case on the ground that a longer period of time passed between the execution of the will and its submission to the court for probate. But the number of years that passed by is irrelevant to the question of whether the will was properly executed in accordance with the statutory requirements.
Summary judgment in a contested probate proceeding is rare (Matter of Colverd, 52 AD3d 971, 972 [2008]), and should only be granted where the petitioner sufficiently establishes a prima facie case for probate and the respondent fails to raise any genuine issue of fact (id.). Although the majority relies on both the attestation clause and attorney-supervision presumptions, neither is applicable. Ms. Sammons’s testimony raises material *441 questions of fact with respect to whether the decedent declared the document she signed to be his will, whether the attorney-drafter supervised the execution, and whether any will ceremony ever had occurred. While Ms. Sammons acknowledged that she could not be certain given the passage of time, she testified both that there was never an occasion in which she signed a document in the presence of a lawyer and the decedent and that she was confident that such an event had not occurred.
Moreover, Ms. Sammons provided specific and credible reasons why she “probably” would remember a will ceremony if one had occurred. As she explained, she thought she would remember if the decedent had asked her to sign a document that he had declared to be his last will and testament, because “it’s very specific” and she could not “imagine him doing that” as he was “very controlling and very private.” Similarly, she gave a specific and credible explanation for why her signature nonetheless might appear on the will underneath the attestation: because of her youth and his “controlling, manipulative nature,” she “probably” would have signed a document if he put it in front of her and told her to sign it. Regardless of what may or may not be the case today, the majority cannot dismiss as implausible the notion that 50 years ago a male employer might be so “very controlling and very private” with respect to a young female employee as to direct her to sign a document and keep her in the dark about its nature.
Furthermore, that a will ceremony is an unusual event is a matter of common experience. For this reason, a trier of fact could conclude that, even 50 years later, a person might well remember participating in it. As the Court of Appeals explained, embedding the will ceremony in the memory of the attesting witnesses is one of the very reasons for the statutory requirements (Pulvermacher, 305 NY at 383). And if a trier of fact were impressed by the demeanor and overall mental state of the person, that conclusion would be all the more reasonable. Obviously, the majority knows nothing about Ms. Sammons’s demeanor and has no basis for being unimpressed by her overall mental state. Nonetheless, the majority concludes that no trier of fact reasonably could conclude that Ms. Sammons was correct that she “probably would” remember a will signing ceremony if it had occurred. Although this startling conclusion is left unstated in the majority’s writing, it nonetheless is implicit in the majority’s ruling.
The key to this appeal is that the inference that Ms. Sammons would have remembered a will ceremony is one to which the objectant, as the opponent of the motion for summary judg *442 ment, is entitled (see Consolidated Edison Co. of N.Y. v Jet Asphalt Corp., 132 AD2d 296, 300 [1987]). I agree that Ms. Sammons’s testimony must be read “in context.” But that banality cannot be a license to disregard specific testimony bearing on the crucial subjects of the witness’s testimony. By affirming, the majority vitiates the principle that the court’s function on a motion for summary judgment is issue finding, not issue determination (Rodriguez v Parkchester S. Condominium, 178 AD2d 231, 232 [1991]). Although the majority does not acknowledge that it is weighing the evidence and finding that the better conclusion is that the decedent executed the will in accordance with the statutory requirements, that is precisely what the majority does. Accordingly, I would reverse the grant of summary judgment.